[L. A. No. 13972. In Bank.—July 30, 1935.]

D. O. BRANT, Appellant, v. CALIFORNIA DAIRIES, INC., et al., Respondents.

Chapman & Chapman and Ward Chapman for Appellant.

Gibson, Dunn & Crutcher, E. E. Bacon and Norman S. Sterry for Respondents.

LANGDON, J.—This is an action for breach of contract to distribute milk.

Plaintiff is the owner of a dairy ranch in Los Angeles County, where he produces a high grade of milk from pure-bred Guernsey cows. In 1925, Crescent Creamery Company, defendant's predecessor, took over the marketing and distributing of plaintiff's milk, under an agreed schedule of prices, subject to modification by mutual agreement, and without any fixed duration for the contract.

Some time prior to 1929 defendant California Dairies, Inc., succeeded to the business of Crescent Creamery Company,

and proceeded with the distribution of plaintiff's milk on the same basis. In January of that year plaintiff informed K. L. Carver, vice-president in charge of sales of defendant company, that he was dissatisfied with their marketing agreement, which did not handle his entire output, and that he proposed to reduce his herd unless an arrangement to take the surplus could be made. A number of letters were written by plaintiff and Carver. It is plaintiff's contention that these letters resulted in a contract whereby defendant agreed to market a certain quantity of milk, 950 quarts per day, increasing this amount each month by 50 quarts, until a maximum of 1500 quarts was reached; and that the contract was not terminable except upon one year's notice. It is defendant's contention first, that Carver had no authority to bind defendant to any contract involving purchase of a definite quantity of milk, for a definite period and at a fixed price; and second, that if he had such authority, the contract actually entered into was a trial arrangement which could be terminated by defendant if the obligation became burdensome.

After some performance, defendant, on or about March 27, 1930, notified plaintiff that it would refuse to distribute his milk after April 10, 1930. Thereafter defendant refused plaintiff's tender of milk, and plaintiff disposed of his product elsewhere. The present action for damages followed. The complaint seeks damages for shortages prior to the time of notice of discontinuance, as well as for breach of the executory obligations.

The trial court found, in brief, that Carver in good faith believed that the agreement was simply one to attempt increased distribution, and that if this proved unsuccessful, the parties were to negotiate for a price reduction or other modification of terms, and that if this could not be agreed upon, then they were to be mutually released. Accordingly the court concluded that the minds of the parties had never met, and that defendant committed no breach when it failed to distribute the above mentioned quantities of milk, and failed to give one year's notice of termination of the agreement.

Judgment was given for defendant, and plaintiff appealed.

The negotiations of the parties were by correspondence, and the agreement is to be found in the letters interchanged by them. It is necessary, therefore, to set forth this correspondence in some detail.

On January 19, 1929, plaintiff wrote Carver that unless defendant was willing to take substantially his entire output at a fixed price, he was going to sell part of his herd and terminate the agency.

Carver did not at once reply, but on February 7th, he wrote plaintiff as follows:

"If we can keep our present pace of increasing Brant sales, we should be able to add at least an average of fifty quarts per day per month for a few months. My thought is that *instead of accepting the proposition you offer,* we should continue on the old basis, but with a commitment on our part to sell and pay for at our present price, until your present surplus production is absorbed, at least fifty quarts per day on the average more than we have sold during each preceding month.

"If, with this commitment hanging over our heads, it still becomes absolutely impossible for us to increase our sales this rapidly and the *burden of paying the penalty* that might result from our not being able to increase sales as outlined above, should become unbearable, then we will have to put our feet under the same table and talk it over—either admit that we have fallen down and release you to make some other connection, or work out whatever seems best at the time.

"Frankly, I hesitate to make the above commitment; nevertheless, I realize your position and I want to do everything reasonable to improve the situation so that you will be satisfied. I always have been enthusiastic about the marketing of your milk and I feel that it would be a very severe blow if we ever had to give it up."

On February 11, 1929, plaintiff replied to Carver's letter, as follows:

" . . . in foregoing this change of making a sale of a good part or all of our cows, I think it only right that *you agree to give us as much notice if you discontinue your agreement as you ask for building up our trade to the 1500 quart limit,* so that we will have ample time to make other arrangements for the successful sale of our milk which will have fallen away under your management if you find it necessary to discontinue. *This time period, as it works out under our plan, is one year.*

*"I will understand in accepting your commitment that you agree to the points above made, which are briefly 950 quarts*

*as the starting point for January, 1000 daily for Feb. and so on; one year's notice of discontinuance* and approval in advance for our half of the advertising expenses which will be necessary to sell the milk.

"*Unless I hear from you to the contrary, I will understand that the above is also your understanding. . . .*"

Carver made no reply to this letter, and plaintiff wrote him again on March 4, 1929, requesting a reply to the letter of February 11, 1929.

On March 7, 1929, Carver made this reply:

·"*From the last paragraph of your recent letter, I assumed that it would not be necessary for me to answer your letter confirming the arrangement, unless I disagreed on some of the points. I believe our letters pretty well set forth what our understanding is, when coupled with our previous arrangements.*

"When I get to it, I believe I should recap our various arrangements and letters into one condensed document, which would be concise and to the point.

"*In the meantime, we will continue to operate as per our recent correspondence.*"

In reliance upon this understanding, plaintiff gave up the opportunity to sell any part of his herd, and installed additional equipment.

In a letter dated June 8, 1929, Carver referred to bills for shortages during the months of April and May, stating: "*These figures* are perhaps correct and *are in accordance with our agreement made about the first of the year;* however, we certainly should have the number of quarts of milk represented by these shortages to us as a credit against these charges."

There can be no doubt that the above correspondence resulted in a contract by the terms of which Carver undertook to bind defendant to market increasing quantities of plaintiff's milk each month; and that the agreement was made not subject to termination except upon one year's notice. Carver's indefinite counter-proposals were definitely rejected by plaintiff; the terms of plaintiff's proposal were stated clearly and explicitly, and Carver's letter of March 7, 1929, was undoubtedly an acceptance thereof.

The trial court, as stated above, found that the minds of the parties never met. This finding is based upon certain

testimony of Carver, admitted over plaintiff's objection. Counsel for defendant read that portion of plaintiff's letter which specified one year's notice of discontinuance, and then asked Carver: "Q. *What interpretation did you put on the clause asking for a year's time?* A. I don't know that I paid any particular attention to that at the time. I considered the letter as a whole. Other than that if our prices be re-adjusted so it was possible for us to sell the milk, I was perfectly willing to allow a year's notice, because at the time I had no intention of discontinuing the sale of the milk if we could make a price that would make it possible for us to sell it." "Q. *Did you interpret* that request for a year's notice as an agreement that if you could not sell it at the then price, and could not make an adjustment, that you would have to continue for a year? A. No, absolutely not. . . . "

Other statements of similar character were admitted. Together they amount to nothing more than a statement of what Carver personally believed the agreement of the parties to be. But it is now a settled principle of the law of contract that the undisclosed intentions of the parties are, in the absence of mistake, fraud, etc., immaterial; and that the outward manifestation or expression of assent is controlling. This is the "objective" standard, established by the modern decisions and approved by authoritative writers. (See *Zurich Gen. Acc. etc. Co.* v. *Industrial Acc. Com.*, 132 Cal. App. 101 [22 Pac. (2d) 572] ; *McConnell* v. *Lamontagne*, 82 N. H. 423 [134 Atl. 718] ; 1 Williston, Contracts, sec. 21, p. 21; 4 Wigmore, Evidence, 2d ed., p. 191; Restatement, Contracts, sec. 71.) ■ In construing a contract, the question whether an uncertainty or ambiguity exists is one of law, and the lower court's finding on this issue is not binding on appeal. (*O'Connor* v. *West Sacramento Co.*, 189 Cal. 7 [207 Pac. 527].) No showing of mistake is made here; and a fair reading of the correspondence discloses the terms of the agreement without uncertainty. The testimony of Carver as to his intention is in direct conflict with the plain meaning of the writings constituting the contract, and was therefore incompetent and inadmissible under the parol evidence rule. As the court said in *Payne* v. *Commercial National Bank*, 177 Cal. 68, 72 [169 Pac. 1007, L. R. A. 1918C, 328] : " . . . no authority sustains the proposition that under the guise of construction or explanation, a meaning can be given to the

instrument which is not to be found in the instrument itself, but is based entirely upon direct evidence of intention independent of the instrument''. (See, also, to the same effect, *Barnhart Aircraft, Inc.,* v. *Preston,* 212 Cal. 19 [297 Pac. 20]; *Fraters G. & P. Co.* v. *Southwestern Construction Co.,* 200 Cal. 688 [254 Pac. 1097].)

 Defendant seeks to justify the admission of the evidence by citing cases concerned with equivocal *acts,* such as handing over a deed to a grantee, which cases hold that the grantor may testify as to his intent not to make a legal delivery. (See, for example, *Howell* v. *Mays,* 107 Cal. App. 751 [290 Pac. 898].) The distinction, however, is fundamental. Because the act is equivocal, evidence of the intent of the party is competent and relevant to establish its legal effect. But where the terms of an *agreement* are set forth in writing, and the words are not equivocal or ambiguous, the writing or writings will constitute the contract of the parties, and one party is not permitted to escape from its obligations by showing that he did not intend to do what his words bound him to do.

 Some question is raised as to the authority of Carver to bind defendant by such an agreement. Carver was vice-president, member of the board of directors, member of the executive committee, and manager of sales of defendant corporation. The lower court found, however, that though Carver had authority to contract to handle the milk on an agency basis, he had no authority, actual or ostensible, to contract for its purchase, and that plaintiff failed to exercise due care in ascertaining the extent of Carver's authority. We may assume that Carver had no actual authority to make the contract. But the record shows that for years he alone dealt with plaintiff, on behalf of defendant company, as well as its predecessor; that he handled all of the negotiations and made all of the contracts with plaintiff for the handling of his milk; that all modifications and changes in price were made by conference with him; that this particular contract resulted from protracted correspondence; and that defendant company received the benefits of plaintiff's performance for a considerable period, without ever giving any notice of limitations on Carver's authority. It further appears that after defendant company had succeeded to the business of Crescent Creamery, plaintiff, on January 9, 1928, wrote to ''Mr. K. L. Carver,

California Dairies, Inc.'', and inquired what, if any, change in their arrangements would take place by reason of the coming in of this new corporation, and specifically asked: ''who are we now doing business with?'' No written answer was made to the letter, but plaintiff testified that Carver stated orally that there would be no change, and this statement is not disputed by Carver. There are, therefore, all of the necessary elements of ostensible authority, despite any secret limitations or defective authorization. (See *Leavens* v. *Pinkham & McKevitt,* 164 Cal. 242 [128 Pac. 399]; *Robinson* v. *American Fish & Oyster Co.,* 17 Cal. App. 212 [119 Pac. 388]; *Newton* v. *Johnston Organ etc. Co.,* 180 Cal. 185 [180 Pac. 7]; *Stevens* v. *Selma Fruit Co.,* 18 Cal. App. 242 [123 Pac. 212]; *Fairbanks* v. *Crump Irr. etc. Co.,* 108 Cal. App. 197 [291 Pac. 629, 292 Pac. 529]; Restatement, Agency, sec. 43.)

It is finally contended that even though plaintiff's interpretation, that is, of a binding contract terminable only by one year's notice, be accepted, still plaintiff was guilty of a material breach of condition in failing to make the necessary price adjustments upon which Carver understood defendant's obligation rested. The answer to this is simply that the correspondence contains no such condition, except by inference in Carver's counter-proposal which was rejected by plaintiff. It may be observed, however, that the record contains a good deal of correspondence in which plaintiff displayed a thoroughly cooperative spirit in this connection, and no justification appears for the conclusion that he arbitrarily refused to agree to price reductions.

The judgment is reversed.

Preston, J., Thompson, J., Seawell, J., Shenk, J., and Waste, C. J., concurred.

Rehearing denied.