[L. A. No. 20252. In Bank. Jan. 23, 1948.]

SAM A. EDWARDS, Appellant, v. SUE E. BILLOW, Respondent.

Maurice Gordon for Appellant.

William Ellis Lady for Respondent.

SCHAUER, J.—Plaintiff real estate broker appeals from an adverse judgment in his action to recover a commission which he contends that he earned by procuring a purchaser for certain real property owned by defendant. Trial was before the court sitting without a jury. Plaintiff attacks the judgment on the grounds that the evidence is insufficient to support certain essential findings and that the trial court committed prejudicial error in overruling plaintiff's objections to various questions asked by defendant of one of plaintiff's witnesses. We have concluded that evidence properly admitted supports the findings attacked by plaintiff, that no prejudicial error is shown, and that the judgment must be affirmed.

Plaintiff alleges in his complaint that on or about December 24, 1944, defendant by a written instrument, termed by the parties a "listing agreement," "employed, engaged and authorized" plaintiff to procure a purchaser for described real estate owned by defendant, at a price of $105,000, and by the same writing agreed to pay plaintiff for his services

"a sum equal to five per cent" of the price of $105,000; that pursuant to such written authority plaintiff, acting as defendant's agent, "procured and induced" Mr. and Mrs. Don MacQuarrie to offer in writing, on or about December 27, 1944, to purchase defendant's property; that the offer, which is set out in full in the complaint,* was "subscribed by Mr. and Mrs. MacQuarrie and [by] defendant."

Plaintiff next alleges "That said offer was accepted by the said defendant SUE E. BILLOW who endorsed her acceptance of the same in writing upon the paper containing said offer as the same is set forth hereinabove. That said DON MAC-QUARRIE and his wife, MRS. DON MacQUARRIE, have at all times been ready, willing and able to purchase the property upon the terms specified in said offer. That said defendant SUE E. BILLOW has refused and continues to refuse to consummate the sale of the said property to the MacQUARRIES."

For a second and further cause of action plaintiff alleges that defendant "became indebted" to him in the sum of $5,250 for "services, work and labor . . . done by plaintiff as a real estate broker" for defendant at her "special instance and request."

---

*The offer reads as follows:

"                    OFFER TO BUY

                LOS ANGELES, CALIF.   12-27, 1944
WE, OFFER THE SUM OF _____ ($105000.00),
One Hundred Five Thousand DOLLARS,
FOR THAT CERTAIN, Brentshire Motel,
CONSISTING OF, Furniture, Furnishings & property,
except furniture in living quarters,
LOCATED AT 12226 Wilshire Blvd. Santa Monica, CALIFORNIA,
WE AGREE TO THE FOLLOWING TERMS, _____ ($35,000),
Thirty Five Thousand DOLLARS, _____ CASH, _____,
THE BALANCE, PAYABLE, MONTHLY AT THE RATE OF _____
($800.00), OR MORE,
Eight Hundred & No/100 DOLLARS, _____ OR MORE,
INCLUDING, INTEREST AT THE RATE OF _____ (5%), PER
ANNUM, $400.00 on First and $400 on 2nd, T.D.
WE ARE, HEREWITH MAKING A DEPOSIT OF ($1000.00),
One Thousand & no/100 DOLLARS, TO SUBSTANTIATE
THIS OFFER.
IT IS FULLY AGREED AND UNDERSTOOD THAT MILL-
EDWARDS-MILL WILL RETURN THIS DEPOSIT, IN FULL,
IF THE ABOVE OFFER IS NOT ACCEPTABLE TO THE SELLER.
Subject to Satisfactory Inventory.
Above includes 5% Commission.
SUE E. BILLOW                    DON MacQUARRIE

                                 MRS. DON MacQUARRIE''

In her answer to the complaint defendant denies any liability or indebtedness to plaintiff; in this connection she denies all allegations of the paragraph of the complaint wherein plaintiff alleges the execution of the MacQuarrie offer and the acceptance thereof by defendant except that defendant admits "having signed her name on some paper"; she also denies all allegations of the paragraph averring that the purchasers produced by plaintiff "have at all times been ready, willing and able to purchase the property upon the terms specified in said offer."

In further answer to the complaint defendant alleges, among other things, that at the time she signed the written listing agreement dated December 24, 1944, the condition of her eyes was such that she was unable to read and that she so informed plaintiff; that plaintiff thereupon stated to defendant that the listing agreement provided that defendant "would be under no obligation to pay a commission to him unless" defendant's property "was actually conveyed to a purchaser he [plaintiff] might find," and that it was "not necessary" for defendant to read the listing agreement; that solely in reliance upon such statements by plaintiff defendant signed the agreement. Defendant also alleges that "there was no consideration" for the so-called listing agreement.

Prior to trial defendant amended her answer to allege further that during all the transactions between the parties, "there was a confidential relationship existing" between defendant and plaintiff and plaintiff's salesman, A. V. Siders; that although defendant's property at all times concerned was worth $125,000 she was unaware of that fact until it was disclosed when, during the taking of the deposition of A. V. Siders, he testified that it was his personal opinion that the value was $125,000; that neither plaintiff nor Siders had ever theretofore informed defendant either of the fact of the true value of defendant's property or of the opinion of Siders as to its value; that had defendant theretofore known of such fact or of the opinion by Siders "she would have been unwilling" to sell the property for "any sum less than $125,000.00."

At the close of the testimony defendant, upon permission of the court, filed a further amendment to her answer in which she alleges that after she signed the MacQuarrie offer to buy, escrow instructions were prepared under the direction of plaintiff's salesman, A. V. Siders, by which it was

specifically agreed between the MacQuarries and defendant that consummation of the proposed sale should be contingent upon the obtaining of an agreement from the holders of a second trust deed on the property subordinating, their lien to a $44,000 first trust deed which the MacQuarries were to execute in favor of defendant. Defendant further alleges that through no fault of hers the subordination agreement was not obtained, and that therefore the sale could not be consummated and plaintiff is entitled to no commission.

The trial court found that at the request of one of plaintiff's salesmen (A. E. Siders, not A. V. Siders) defendant signed a "listing card" which the salesman had filled out; that at the time of signing the card defendant could not read because of the condition of her eyes and "did not read the matter appearing" on the card; that she relied on the salesman for information concerning its contents. The listing card is set forth in full in the findings. It bears the date of "12/24/44" and in it appear the address of and various items describing defendant's property. The price and terms of sale are also set forth, as follows: "Mortgage: Carry 1st Price: 105000 Cash: 30,000." Then, immediately above defendant's signature, is the following clause: "I, the undersigned, owner of the above described property, . . . in the event it is sold by [plaintiff] . . . for the price and terms given or any other price and terms accepted by me, . . . promise and agree to pay a commission of . . . (5 percent) or to give all over and above net listing price."

The court further found that on or about December 27, 1944, one A. V. Siders, another of plaintiff's salesmen, presented to defendant the offer to buy signed by the MacQuarries, which is set forth in plaintiff's complaint, and requested defendant "to accept same by signing her name thereto"; that defendant was still unable to read and signed the offer without reading it. It is also found that at the time such offer was presented by Siders and signed by defendant "it was the intention on the part of all parties, . . . the MacQuarries and defendant . . . [and] plaintiff and his salesman A. V. Siders . . ., that the terms and conditions of the sale proposed to be made by the defendant . . . to the said MacQuarries, including the payment of a real estate or broker's commission, should be incorporated in a further written agreement in the form of written escrow instructions"; that in fact a bank escrow officer, in accordance with directions from plaintiff's salesman A. V. Siders who gave to such officer "all the terms

upon which defendant . . . was willing to sell and the said MacQuarries were willing to purchase'' defendant's property, ''prepared a formal agreement covering the sale and purchase of said property in the form of escrow instructions and embodied therein all the terms and conditions of said sale . . . and that after the preparation thereof the said MacQuarries and defendant . . . signed and delivered the same.''

The above mentioned escrow instructions are made a part of the findings. Such instructions bear the date of December 29, 1944, and state, among other things, that Mr. and Mrs. MacQuarrie, the proposed purchasers, will pay into escrow the sum of $35,267.85, ''$10,000.00 of which amount is being deposited at opening of escrow,'' and will deliver to the escrow agent a trust deed ''to secure note for $44,000.00, dated today, Principal and Interest payable in installments of $400.00, or more, on the 15th day of each month, commencing March 15, 1944 [sic], including interest at 5 per cent . . . in favor of Sue E. Billow.'' The instructions also direct the escrow agent to ''use'' the money and instruments deposited provided that on February 14, 1945, a title policy to the property had been issued to the MacQuarries. The escrow agent was also instructed to ''Prorate interest on second Trust Deed of record, . . . to close of escrow unpaid balance to be $25,732.15.'' The instructions further provide that ''In the event that the conditions of this escrow have not been complied with at the expiration of the time provided for herein, you are instructed to complete the same at the earliest date possible thereafter, unless we or either of us shall have made written demand upon you for the return of the money or instruments deposited by either of us. In which case you are instructed to return all instruments and/or cash to the respective parties hereto and this escrow will without further notice be considered as terminated.'' Then appear the signatures of Mr. and Mrs. MacQuarrie. Below their signatures and above that of defendant are the following provisions: ''All the conditions and demands above are hereby approved . . . Pay to Mill-Edwards-Mill a licensed real estate broker . . . as a commission the sum of $5,000.00. It is understood and agreed that the above escrow instructions are contingent upon obtaining a Subordination Agreement from Peter Xeniades and Peggy Xeniades [holders of the second trust deed on the property] . . . within 5 days from date hereof. . . . [T]he provisions for extension of time within which escrow

may be closed, cancellation of same, return of instruments and/or money applies equally to me." Defendant's signature then appears. The court found that all of the terms of the escrow instructions signed by the buyers were accepted by defendant except that she required that the subordination agreement be secured within five days.

It is further found that the salesman, A. V. Siders, "acting . . . on behalf of plaintiff, assumed to obtain" the execution of a subordination agreement by the Xeniades, but that the latter failed to execute it, and therefore "it was not possible to consummate said sale upon the terms and conditions finally offered by the said MacQuarries"; that "failure to consummate the sale . . . was through no fault on the part of defendant . . . but solely by reason of the fact that the said MacQuarries were not able to comply with the terms and conditions of their offer"; that "plaintiff did not . . . produce a purchaser able, ready and willing to purchase . . . upon the terms . . . offered . . . by her [defendant's] listing contract with plaintiff, or otherwise" and defendant owes plaintiff nothing; that defendant has received no moneys "out of which plaintiff is entitled to have and receive" the claimed commission.

The court also found that in the transaction a confidential relationship existed between defendant and plaintiff and A. V. Siders; that defendant's property "at all the times mentioned in the pleadings" was worth at least $125,000 which fact was known to Siders and plaintiff at all times concerned but was unknown to defendant until after this action was filed; that had defendant known Siders' opinion of the value she would have been unwilling to sell for less than $125,000; that plaintiff and Siders in not informing defendant of the value did not act in good faith toward defendant and are estopped to recover a commission.

As to the defenses of lack of consideration for the listing agreement and that a commission was to be paid only on actual conveyance of defendant's property the court made no findings for the stated reason that defendant "abandoned" such defenses.

■ Plaintiff contends that his right to a commission accrued immediately upon the signing by defendant of the December 27 written offer of the MacQuarries, and that the evidence is not sufficient to sustain the finding that at the time plaintiff's salesman A. V. Siders secured defendant's signature to such offer, "it was the intention . . . of all parties

. . . the MacQuarries and defendant . . . plaintiff and . . . A. V. Siders . . . that the terms and conditions of the sale . . ., including the payment of a . . . commission, should be incorporated in a further written agreement in the form of escrow instructions.''

Defendant testified as follows: She signed the listing card in October, 1944, and at that time stated to A. E. Siders, who on plaintiff's behalf solicited the listing, that she would sell her property, which is referred to as a ''motel,'' only at a price of $105,000, of which the broker would receive $5,000 commission and which would net her $100,000, and that she wished to receive $30,000 or $35,000 in cash and to herself carry a first mortgage of $44,000; and she told A. E. Siders further that the balance of the purchase price over the cash payment was to be paid at the rate of $400 a month for herself on a first mortgage and $400 to the Xeniades on the second trust deed which they held on the property. At the time (on December 27 or 28, 1944) she signed the MacQuarrie offer she repeated to the salesman then present, A. V. Siders, that she wished $30,000 or $35,000 in cash and to receive a first mortgage of $44,000 on the property. She wished to use the cash payment to pay off a first encumbrance held by a bank against the property. Because of trouble with her eyes she was unable to and did not read either the listing card or the MacQuarrie offer but accepted and acted upon what the respective agents told her as to the contents of the documents. She wished to go out of business but was willing to sell only if she ''could have the $44,000.00 on interest.'' The day after she signed the MacQuarrie offer A. V. Siders returned to see her at the motel and stated that the MacQuarries, who were with him, were ''ready to go to escrow.'' Defendant thereupon accompanied them to the bank which handled the escrow. At the bank Siders stated to defendant that he ''gave the escrow officer the information to put in the escrow instructions'' and stated further that ''we would have to get Mr. Xeniades to carry the second mortgage. . . . would have to get a subordination from Mr. Xeniades to carry the second mortgage. . . . that his second trust deed would be subject'' to defendant's $44,000 first encumbrance. The same Mr. Siders (A. V.) and defendant then met at the office of an attorney by whom defendant wished to have the subordination agreement prepared and Siders explained to the attorney ''about the subordination. . . . what he wanted.''

The following day Siders picked up the subordination agreement from the attorney's office, while defendant was present, and said that he would take it to the Xeniades for execution. Later Siders telephoned defendant that he did not "get" the agreement from the Xeniades and "was going to try to work out something else." Subsequently, on January 5, 1945, Siders submitted to her a new offer in the form of proposed new escrow instructions under which she would have been paid all cash for her interest in the property but she refused to accept the new terms as she wished to sell only if she received the $44,000 first encumbrance. At no time did she state to Siders or others a willingness to accept all cash. Defendant was willing to sell under the terms specified in the instructions signed by her but after learning that they would not be carried out defendant on January 13, 1945, withdrew from the escrow.

The salesman A. V. Siders in answer to the question, "Was there some discussion at the time that document [the MacQuarrie "Offer to Buy"] was signed that it would be necessary to go to escrow and have instructions to cover the details?" stated, "Well, we always give instructions on details of escrow." And to the question, "at that time when you had this [the offer] signed . . . you did not know the exact amount of the second trust deed, did you?" Siders replied, "Not the exact amount to the penny."

It should be noted that the "Offer to Buy" does not state in whose favor the respective trust deeds mentioned therein should run; it does not appear from such offer whether the procurement of a loan entailing the advancement of funds was necessary nor is it declared on the face of such offer whether the obligation to negotiate a loan or loans, if any, was to rest on the buyer or on the seller; it does, however, appear that two encumbrances in favor of some undesignated creditor or creditors were contemplated. In such respects the offer on its face appears to be uncertain and incomplete.

It is apparent that the evidence hereinabove quoted or summarized supports the finding that all parties to the proposed purchase by the MacQuarries of defendant's property, including plaintiff and his agent A. V. Siders, intended at the time the document entitled "Offer to Buy" was signed "that the terms and conditions of the sale . . ., including the payment of a . . . commission, should be incorporated in a further written agreement in the form of written escrow instructions" and such evidence also supports the further

implied finding that the "Offer to Buy" did not constitute a complete or final contract. Under such circumstances this court will adhere to the interpretation placed by the trial court on the writings and the conduct of the parties. (See *Estate of Rule* (1944), 25 Cal.2d 1, 11 [152 P.2d 1003, 155 A.L.R. 1319]; *Palmtag* v. *Danielson* (1947), 30 Cal.2d 517, 522 [183 P.2d 265].) It is also apparent that plaintiff through his agents, the two Siders, was aware of the existence of the Xeniades' second encumbrance and of the necessity of either securing a subordination agreement from them or of satisfying their lien in order to comply with one of the terms upon which defendant informed plaintiff she would sell and which particular term or condition is set forth in the listing card, in the "Offer to Buy," and in the escrow instructions; i. e., the execution of a valid first encumbrance in defendant's favor by the proposed purchasers.

Plaintiff agrees that he is entitled to recover only if, pursuant to a written contract so to do, he found a buyer ready, able and willing to buy upon the "stipulated terms." He argues, however, that the MacQuarries were ready, able and willing to buy under the terms of their written offer; that, in any event, defendant accepted such offer and is consequently estopped to dispute the readiness, willingness and ability of the proposed purchasers to perform according to the terms of their offer. In support of his last stated proposition plaintiff relies upon such cases as *Sobaje* v. *Schubert* (1918), 37 Cal.App. 709, 713-714 [174 P. 364]; *Grove* v. *Lewis* (1932), 125 Cal.App. 357, 359-360 [13 P.2d 847], and cases there cited. (See also *Rucker* v. *Hubler* (1922), 56 Cal.App. 771, 773 [206 P. 472]; *Caine* v. *Briscoe* (1926), 78 Cal.App. 660, 670 [248 P. 774]; *Spalding* v. *Bennett* (1928), 93 Cal. App. 577, 583 [269 P. 948]; *Malmstedt* v. *Stillwell* (1930), 110 Cal.App. 393, 398 [294 P. 41], and cases there cited; *Deeble* v. *Stearns* (1947), 82 Cal.App.2d 296, 299 [186 P.2d 173].) In *Grove* v. *Lewis* (*supra*) the rule is stated as follows (quoting from *Malmstedt* v. *Stillwell, supra*): "[W]here the owner accepts the buyer procured—which the evidence sufficiently shows was true in the present case—he thereby admits the readiness, willingness and ability of the purchaser to consummate the sale." (P. 359 of 125 Cal.App.) In each of the other cited cases it likewise is shown that the owner did accept the buyer produced by the broker. Under such circumstances the application of the quoted rule appears

to be founded on principles of estoppel. Thus it is pointed out in *Caine* v. *Briscoe* (1926), *supra*, 78 Cal.App. 660, 670, that "There was and is no claim made by defendant [owner] that he was induced to accept the offer of the buyers to purchase the properties by any act of fraud on the part of the plaintiff [broker] or that such acceptance was brought about through a mutual mistake regarding the facts or the terms of the offer. Hence, the case, so far as the present point is concerned, falls within the rule stated as follows in 4 Ruling Case Law, page 309 : 'Once the customer procured by the broker is accepted by the employer, the latter is thereafter estopped from denying the purchaser's ability or willingness to complete the contract, inasmuch as he is not bound to accept the offer of such person without a reasonable opportunity to inquire and satisfy himself in relation to it. Consequently his acceptance should estop him from alleging anything against the claim except fraud on the part of the broker in inducing the acceptance.' " And in *Spalding* v. *Bennett* (1928), *supra*, 93 Cal.App. 577, 583, it is stated that "When the customer procured by the agent is accepted by the owner and the lease is executed upon terms satisfactory to the owner, he is estopped from denying the ability or willingness of the customer to consummate the contract."

By contrast, in the case now before us it appears that defendant did not unconditionally accept the proposed purchasers or the offer procured by plaintiff, but in the escrow instructions, which as found by the court were contemplated by all parties as the medium for expression of the final and complete agreement, expressly conditioned her acceptance of the offer and her liability to pay a commission to plaintiff, upon the obtaining of the subordination agreement which she testified A. V. Siders had informed her would be needed in order to comply with the terms upon which she had indicated her willingness to sell. And as indicated above, plaintiff was aware at all times of the existence of the Xeniades encumbrance. Thus there is not here present the element of estoppel or unfair conduct by the owner toward the broker which as noted above appears to be the basis of the rule upon which plaintiff relies.

In support of his contention that the MacQuarries actually were ready, willing and able to perform according to the terms of their offer plaintiff argues that it was the obligation of defendant, rather than of plaintiff or the MacQuarries, to secure the subordination agreement, and that,

therefore, failure to secure the agreement and to consummate the proposed sale are the faults of defendant. But plaintiff's argument in this regard ignores the fact that defendant's acceptance of the MacQuarries' offer, as expressed in the escrow instructions, was specifically conditioned upon the securing of the subordination agreement and was devoid of an undertaking to secure it herself; consequently plaintiff cannot impose on defendant the responsibility for failure by the Xeniades to execute such subordination agreement.

Plaintiff argues further that "in any event the agreement of respondent [defendant] to accept $800.00 per month *or more* recited in the Offer to Buy gave the buyers the privilege to pay the *entire* purchase price to respondent at one time; that the evidence without dispute showed that such arrangements to pay the whole purchase price were made by the MacQuarries but that it was refused by respondent." As quoted above, the "Offer to Buy" states that the balance of the purchase price over the $35,000 cash payment would be payable monthly at the rate of $800 or more, including interest at the rate of 5 per cent per annum, "$400.00 on First and $400 on 2nd, T. D." The escrow instructions, which, as previously noted, declare the terms finally agreed upon and which under the findings made, necessarily supplement and qualify all previous writings, state that the MacQuarries "will deliver" into escrow a trust deed "to secure note for $44,000.00 . . . payable in installments of $400.00, or more" on the 15th day of each month including interest at 5 per cent in favor of defendant. The evidence indicates that following the refusal of the Xeniades to execute the subordination agreement the MacQuarries made other arrangements to finance the purchase and on January 5, 1945, offered to pay defendant cash in full for her interest in the property. However, as discussed hereinabove, defendant's acceptance of the MacQuarries' offer was, as shown in the instructions, expressly made contingent upon the obtaining of the subordination agreement from the Xeniades within five days from December 29, 1944. The agreement was not obtained within the specified period; the cash offer of January 5th was a new offer to buy, but was not performance of the contract which had been made; defendant, accordingly, was under no obligation to proceed further under the old contract or to pay a commission for securing the new offer which she did not accept.

In view of the fact that, as shown above, the evidence supports the finding of the trial court that the proposed buyers produced by plaintiff were at no time ''ready, able or willing to purchase . . . upon the terms . . . offered'' by defendant in the listing contract or otherwise, it becomes unnecessary to consider attacks made by plaintiff upon other portions of the findings and upon the admissibility of certain evidence in support thereof.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.