[L. A. No. 20897. In Bank. May 2, 1950.]

QUADER-KINO A. G. (a Corporation), Appellant, v. SEYMOUR NEBENZAL et al., Respondents.

Herzbrun & Chantry and David Mellinkoff for Appellant.

Fred Horowitz for Respondents.

SCHAUER, J.—In 1946 defendants began suit in a French court to prevent plaintiff from further exhibiting the French language motion picture "Mayerling." Plaintiff thereupon instituted this suit for an injunction against interference with exhibition of the picture and against prosecution of the French suit, and for damages; and from an adverse judgment has taken this appeal. We have concluded that the decision of the trial court (sitting without a jury) that plaintiff's right to exhibit the picture expired in October, 1945, and that plaintiff is entitled to no recovery in this suit, must be upheld.

Resolution of the controversy turns upon the interpretation, with the aid of parol evidence, of two written contracts entered into between the parties hereto in 1944. In the discussion which follows the evidence is viewed in the light most favorable to defendants (respondents), as is required on appeal.

Plaintiff is a corporation formed under the laws of Switzerland. Defendants are Seymour Nebenzal and Nero Films, Inc., a California corporation of which Nebenzal is a stock-

holder, a director, and the president; unless otherwise indicated, however, the designation ''defendant'' will hereinafter refer to Nebenzal only. Also, unless otherwise stated ''Mayerling'' will refer to the French language picture involved in this litigation.

Nebenzal has been in the motion picture business in Germany, France and the United States for some 25 years. In 1935 he produced Mayerling in France for the Concordia Company, the stock of which was owned by Nebenzal, Emile Natan, and Chiel Weissman. The picture in the French language stars Charles Boyer and Danielle Darrieux, and is ''the story of Crown Prince Rudolph of Austria who in 1889 committed suicide.'' It is based approximately 95 per cent upon historical matter in the public domain and upon ''certain features original to the script expressly written for the picture,'' and 5 per cent upon original material (hereinafter termed the ''Anet material'') taken from a novel also entitled Mayerling, authored by the late Claude Anet. The Anet material was used pursuant to a five-year license (hereinafter termed the ''Anet rights''), due to expire in October, 1940, purchased from the author or his heirs. The picture was released in 1935 or 1936.

Thereafter Nebenzal disposed of his interest in the Concordia company, the company was liquidated, and plaintiff became the owner of Mayerling. In 1940 Natan secured an extension of the Anet rights for a five-year period expiring October 8, 1945; lacking those rights the picture could not be shown unless Anet material was eliminated. In 1942 Natan transferred his Anet rights to plaintiff.

In 1943 Nebenzal, then in America, inquired by mail of William M. Gruess, who was plaintiff's attorney-in-fact in New York, concerning possible acquisition of remake rights of Mayerling. After extended correspondence Gruess wrote Nebenzal in January, 1944, that he was authorized to sell the English language remake rights for $20,000, that the Anet rights were extended to October, 1945, and that plaintiff would agree to do its best to secure a further extension at Nebenzal's expense. In March, 1944, Gruess wrote Nebenzal that (because of the war) it was impossible to cable plaintiff in Switzerland or to have plaintiff contact the Anet heirs, as the territory was then occupied by the enemy. Because of the uncertainty as to ''when France would be liberated'' and contact established with the Anet heirs Nebenzal informed Gruess that he

wished to "separate myself from" the Anet rights and would eliminate Anet material from the intended remake of Mayerling, thereby freeing himself from the necessity of securing an extension of the Anet rights in order to show the picture after October, 1945, and that the new picture would be based solely on historical material and on material original to the script of the French Mayerling.

Thereafter by two contracts[1] (hereinafter termed the "main

---

[1]The contracts, so far as here material, provide as follows: *Main Contract:*

". . . Whereas, the Purchaser [Nebenzal] does not desire to use the features peculiar to the Claude Anet novel but base the story of the new production on historical facts, on features original with the script of the Motion Picture . . . and on such new features as he may deem fit to introduce . . .

"*FIRST:* For Value received the Owner [plaintiff] hereby sells, assigns, quitclaims and grants to the Purchaser all the Owner's rights in and to the Motion Picture to the extent that it owns those rights itself, including the right to make and produce a motion picture in English based thereon, as well as the right to use the title 'Mayerling' . . . but excluding those rights expressly excepted and/or reserved herein, PROVIDED, however, that the right to use the novel by Claude Anet or the name of the author thereof is not being transferred. But nothing herein contained shall be deemed to prevent the Purchaser from using any material in said novel which may be in public domain and/or historical in source . . .

"*THIRD:* [Nebenzal agreed not to exploit the new motion picture in ten Central European countries until three years after the cessation of hostilities therein.] . . .

"*FIFTH:* The unqualified right of the Owner to exploit the original French version in the original French language under the title 'Mayerling' is hereby expressly reserved . . .

"*ELEVENTH:* It is agreed that all questions arising on a disagreement, including all questions relating to the construction, performance and enforcement thereof, shall be determined in accordance with the laws of the State of New York . . ."

*Option Agreement:*

The option agreement recites execution of the main contract, and then provides that in consideration of One Dollar it is agreed that:

"*FIRST:* In case the Purchaser should, in the future, for any reason whatever, desire to acquire the rights based on the Claude Anet novel, the Owner grants to the Purchaser the option to acquire those rights to the extent the Owner owns them itself and for the time the Owner owns those rights . . . for the price of One Hundred . . . Dollars,

"PROVIDED, the Purchaser exercises the option . . . within three (3) months after the Armistice concluding the present war in Europe, however, at the latest by July 8, 1945.

"*SECOND:* In the event the Purchaser should exercise the option, the Owner also agrees, upon express request to be made by the Purchaser, to try to the best of the Owner's abilities to obtain an extension of the Claude Anet rights which . . . expire on October 8, 1945, for another five (5) years, provided that the Purchaser . . . furnishes the consideration to be paid the heirs of Claude Anet for that extension . . .

"*THIRD:* Under all circumstances, and without having to make any contribution to the price to be paid to the heirs . . . for the extension . . . the Owner shall be entitled to the use and exploitation of the rights dealt with herein for its own purposes in accordance with the reservations made in the agreement signed simultaneously . . ."

contract" and the "option agreement") dated July 25, 1944, but not delivered or effective until September, 1944, when the cash price of $20,000 was paid, plaintiff (acting through Gruess) sold to Nebenzal all of plaintiff's rights to Mayerling, including remake rights in English, but excepting the Anet material and excepting plaintiff's right to exploit the French Mayerling; and also granted Nebenzal an option to purchase prior to July 8, 1945, plaintiff's Anet rights, and agreed to assist Nebenzal in obtaining at his own expense an extension of the Anet rights beyond their expiration date of October 8, 1945. These are the two contracts differing interpretations of which give rise to this litigation.

Nebenzal, who was not then seeking the Anet rights, did not request the option agreement and when it was presented to him personally by Gruess in New York on July 26 or 27, 1944, he pointed out to Gruess that "I was not interested, for very good reasons, that is why I had them [Anet rights] eliminated from the main contract, in which he was willing to give them to me, and I said I didn't want them. And he said '. . . it doesn't cost you anything, you might as well take them and if you want to take up the option you can take it up; if you don't have to, you don't have to.' . . . I said '. . . I have no intention of using the Claude Anet rights in the remake of the picture.' He insisted, however, it might be useful, so I signed it in view of the fact it was an option, it didn't mean anything to me. I had no intentions of picking up the option . . . [A]s it was an option, which I felt I could pick up or not pick up, I accepted . . ." Nebenzal did not exercise the option and did not request plaintiff to secure an extension of the Anet rights. Subsequently Nebenzal contributed an additional sum of $7500 to obtain a release to himself of Mayerling from the United States Office of Alien Property, which agency was then claiming title to the picture.

In September, 1944, one Marcel Hellman, of London, who was a friend of Nebenzal and of Natan, arrived in New York, where he learned of Nebenzal's intention to remake Mayerling. Hellman then proceeded to Hollywood, where in October, 1944, he and Nebenzal discussed Mayerling and the Anet rights. Nebenzal told Hellman of Nebenzal's acquisition from plaintiff of the remake rights to Mayerling and showed Hellman certain recitals set forth in the main agreement between plaintiff and Nebenzal stating that the Anet rights had been transferred to plaintiff for the period expiring October 8,

1945; and Hellman stated that he had negotiated through his lawyer in Paris for an option to himself acquire motion picture rights in the Anet material for a five or seven year term beyond October, 1945, as he also intended to remake Mayerling; Hellman's proposed option had no connection with the Anet rights formerly held by Natan, which expired in October, 1945. While Hellman was still in Los Angeles he promised to assign to Nebenzal without profit to himself, Hellman (i.e., at Hellman's cost price of between $1,000 and $2,000), the license for Anet rights beyond October, 1945, but stated that he wanted Nebenzal to pay an additional sum of money therefor to Natan, who "was coming back from the wars"; after further discussion Nebenzal agreed to pay Hellman's costs and to give Natan $2,000. Subsequently, while in New York en route to London, Hellman promised Nebenzal's lawyer to make the assignment of his Anet rights to Nebenzal "without any benefit or profit" to Hellman as soon as Hellman reached London and "received the documents."

Hellman returned to Europe, learned that the Anet heirs had declined to grant the option he sought but instead wished to sell outright a license to use the Anet material for a fixed term. He and Natan thereupon purchased in Hellman's name, from the Anet heirs, for between $1,500 and $3,000, a license to use the Anet material for a period of ten years (to October 8, 1955), and (in about March, 1945) decided to ask Nebenzal $10,000 therefor. After some delay and objections to the price Nebenzal paid the $10,000 to Hellman's attorney in New York and on or about October 31, 1945, the assignment (dated July 9, 1945) of the Anet rights from Hellman to Nebenzal was consummated. Nebenzal, who had believed that he had acquired the Anet rights from Hellman in the fall of 1944, had informed plaintiff's agent Gruess of the fact as he believed it in the early spring of 1945.

In the spring of 1946 defendants "heard" that Mayerling was being shown in France or Alsace-Lorraine, and in the fall of that year they instituted suit in France to stop exhibition of the picture, on the theory that inasmuch as plaintiff's Anet license had expired and that all Anet rights to use such material in any motion picture for the 10-year period had been independently acquired by defendants, plaintiff could no longer exhibit or "exploit" the French language Mayerling. In July, 1947, plaintiffs filed this suit, the purpose of which is, as stated hereinabove, to enjoin defendants from interfering with exhibition of the French picture and from further prosecuting the suit in France, and to recover damages.

Plaintiff contends that under the provisions of paragraph numbered FIFTH of the main agreement and that numbered THIRD in the option agreement it had the right, as against Nebenzal, to continue exploiting Mayerling. Plaintiff asserts in this connection that the option agreement describes "the only manner in which the defendant Nebenzal might acquire the Anet rights," and alleges that Nebenzal "and his agents, servants, and employees . . . secretly, maliciously and fraudulently" acquired the Anet license without telling plaintiff, and thereby rendered "it impossible for plaintiff to secure an extension of the Anet rights as provided" in the option agreement "or at all." Plaintiff further argues, in effect, that the option agreement which ostensibly runs in favor of Nebenzal in reality places upon Nebenzal a greater burden or obligation than upon plaintiff; i.e., plaintiff was required only, upon request of Nebenzal, to "try to the best of" its "abilities" to secure extension of the Anet rights beyond October 8, 1945, whereas Nebenzal was absolutely obligated, if by his own enterprise and at his own expense he acquired an Anet license, to deliver such license, or permission to operate under it, to plaintiff.

The court, however, found contrary to plaintiff's allegations of secrecy, malice and fraud, and further found that neither Nebenzal nor any person acting for him "did anything to render it impossible for plaintiff to secure an extension of the Anet rights," and that "the plaintiff since October 8, 1945, has no right to distribute or exploit or exhibit . . . Mayerling anywhere in the world." In an oral decision delivered at the conclusion of the trial, the trial judge declared his view of the evidence and of the contracts between the parties, as follows: By the main contract plaintiff "reserved to itself the right to exploit the original French version of Mayerling, and while it does not say so, it must be construed to be to the extent that the plaintiff owned or continued to own those rights.

"Now it is conceded by all concerned that the right to exhibit or exploit, as is the term used throughout here, a motion picture, ends in any country with the termination of the contractual rights between the author and the producer which, in this case, was October 8, 1945 . . . Now . . . all . . . [the option agreement] amounted to was giving him [Nebenzal] an option to their [plaintiff's] Anet rights to October 8, 1945, if he desired to purchase them, and they agreed

to use their best efforts to get an extension for him without additional cost excepting the cost they were put to following that date. They didn't bind themselves to do anything in particular in that regard excepting to use their best offices.

"Now the effect of all this, it seems to the Court, is that Quader-Kino expected, during this difficult war period, that at the conclusion of hostilities they would be able to readily get an extension of these Anet rights from the heirs of Claude Anet. They did not contemplate, apparently, that anyone else might negotiate for them, or, if they did, that they were not bound in any event under this option agreement to deliver anything additional in such a contingency. Had they desired to bind Nebenzal in the particular in which they have sought to construe these documents, they should have included in their contract some provision to the effect that he would look entirely to them and to no one else for any Anet rights extension, and that he waived any right he might have to such rights subsequent to October 8, 1945, excepting through them . . . [T]he Court finds that there has been no fraud established in this case on the part of the defendants . . . And . . . finds that under the . . . option agreement . . . there is no requirement reserved whereby the defendant had to . . . refrain from preventing the plaintiff from securing the extension of the Anet rights, or that inhibited the defendant from taking the steps which he did in this case."

It is apparent that the evidence hereinabove summarized supports the court's decision and the written findings based thereon. As declared in *Edwards* v. *Billow* (1948), 31 Cal.2d 350, 359 [188 P.2d 748] (see also cases cited therein), "Under such circumstances this court will adhere to the interpretation placed by the trial court on the writings and the conduct of the parties."

Plaintiff urges, however, that under New York law, which was to control construction of the main agreement (see paragraph number ELEVENTH), that agreement either imposed on Nebenzal an *"express duty* to permit plaintiff to continue the exhibition of 'Mayerling' beyond October 8, 1945," or else bound Nebenzal by an "implied covenant" not to interfere with plaintiff's acquisition of an extension of Anet rights and not to use his own independently acquired Anet license to prevent plaintiff from exploiting Mayerling. On this point plaintiff relies first on a statement in *Kirke La Shelle Co.* v. *Paul Armstrong Co.* (1933), 263 N.Y. 79, 87 [188 N.E. 163], that "In the last anlysis those cases only apply the principle

that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing,'' and upon statements from other cases to the effect that good faith and honest dealing are required between contracting parties. ██ Here, however, plaintiff as the party who was selling the Mayerling remake rights received ''the fruits of the contract'' in the form of the $20,000 paid it by Nebenzal; so far as Nebenzal's contractual obligations to plaintiff are concerned Nebenzal had by such payment performed his part of the contract and nothing further remained to be done. Moreover, as found by the trial court, there is no evidence of any but fair and honest dealing on his part. Certainly he had no obligation under the main contract—or under the option agreement either, for that matter—to sit idly by and do nothing when he was told in the fall of 1944 that Hellman had acquired the license or ''extension'' of Anet rights beyond October 8, 1945. He was as free as any other would-be purchaser of those rights to negotiate with Hellman to secure them. Moreover, as found by the trial court and as shown by the evidence, he informed plaintiff's agent Gruess as early as the spring of 1945 that he was acquiring the so-called ''extension'' or new license which Hellman had secured.

*Underhill* v. *Schenck* (1924), 238 N.Y. 7 [143 N.E. 773, 33 A.L.R. 303], also relied upon by plaintiff, involves facts and contracts differing materially from those in this case, and consequently is not persuasive to plaintiff's view. Suffice it to say that that action was between a licensor and a licensee, who were to share jointly in the profits of a stage production, and did not involve an outright cash sale such as that from plaintiff to Nebenzal.

Plaintiff further urges that attempts admittedly made by Nebenzal, subsequent to the execution of the two contracts here involved, to purchase from plaintiff all of its rights in the French Mayerling, amounted to a practical construction of the contracts by the parties and a concession by Nebenzal that plaintiff still continued to possess the right to exploit the picture even after plaintiff's Anet rights expired in October, 1945. However, Nebenzal testified that his efforts in this direction, which failed because of lack of agreement on the price to be paid, were for the purpose of acquiring the French negative and prints and of removing ''from circulation en-

tirely the old Mayerling . . . In my negotiations with Mary Pickford, . . . my negotiations before that and after that with Selznick and others, I found that it was most desirable to have the old negative and old prints, and that is, in fact, customary in the industry, that when a remake of an old picture is contemplated, that the major studios do not like to see prints or negatives of the former picture around if it can be avoided. This is customary to such an extent that in every sales contract when you grant a license to a buyer for a limited period of time there is always included a paragraph whereby the license holder is obliged to return to you the prints which he is holding, at the expiration of the license period. Also negatives if he should have any, original or dupe negatives.'' Any conflict in the evidence on this point was resolved in defendant's favor by the trial court, whose determination in this respect is conclusive on appeal.

Plaintiff attacks a finding by the trial court that defendant Nero Films, Inc., is not the *alter ego* of defendant Nebenzal. However, plaintiff concedes in its brief that the court so found ''Since the doctrine of *alter ego* arises only to prevent fraud or injustice, and the trial court felt there was neither.'' Inasmuch as the court's finding that plaintiff had failed to establish fraud or injustice is supported by the evidence, it is obvious that plaintiff is not prejudiced by the finding of which it complains.

Plaintiff next urges that a finding that Nebenzal assigned to defendant Nero Films, Inc., the Mayerling remake and the Anet rights, and that Nero Films, Inc. reassigned to Nebenzal, is not supported by the evidence. In view of the finding against fraud and injustice on Nebenzal's part it is apparent that this finding likewise is not prejudicial to plaintiff. However, the record reveals both oral and documentary evidence unnecessary to relate here which support it. There is an obvious clerical error in another finding (No. XI), in which the phrase ''which the *defendant* had advised the defendant'' was meant to read ''which Hellman had advised the defendant,'' but it furnishes no ground for reversal.

Finally, plaintiff contends that the court erred in including in the judgment a statement ''That ever since October 8, 1945, the plaintiff, Quader-Kino A.G., a corporation, did not have and does not now have any right to distribute, exploit or exhibit the motion picture Mayerling anywhere in the world.'' Plaintiff in its complaint alleged that it is ''owner of the world-wide'' rights to Mayerling, and defend-

ants denied the allegation. In order to completely determine the rights of the parties the court by its judgment correctly defined those rights according to the findings. (See *O'Melia* v. *Adkins* (1946), 73 Cal.App.2d 143, 148 [166 P.2d 298].)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., and Spence, J., concurred.

TRAYNOR, J., Dissenting.—I cannot agree that the contracts between Quader-Kino and Nebenzal do not give Quader-Kino the right to enjoin Nebenzal's interference with the exploitation of their motion picture.

Defendant Nebenzal acquired by purchase the right to produce a remake of plaintiff's "Mayerling" in English. To get that right Nebenzal had to pay $20,000 and to agree not only that plaintiff retained "the unqualified right" to exploit its original French version of "Mayerling" without restriction as to time, but also that Nebenzal's remake would not compete with the French version in certain countries until three years after the cessation of hostilities. These conditions in plain language assured plaintiff the right to continue the exploitation of "Mayerling" without interference from Nebenzal.

Nebenzal now attempts to prevent that exploitation notwithstanding that his promise not to interfere therewith was part of the consideration for the sale of the remake rights. Defendant seeks to justify his action on the ground that he now owns the Anet rights on which 5 per cent of "Mayerling" is based and that, since the Anet heirs or any third person acquiring the rights could prevent the exhibition of the picture so long as it incorporates the Anet material, Nebenzal may also prevent its exhibition. So far as Nebenzal is concerned, however, his ownership of the Anet rights is immaterial. The reservation of the "unqualified right" to which Nebenzal agreed does not admit of the qualification "if Quader-Kino acquires an extension of the Anet rights before Nebenzal beats them to it." As between Nebenzal and Quader-Kino, the latter's reserved right was "unqualified," as the contract stated.

Upon the granting of the remake rights to Nebenzal the most serious threat to plaintiff's exploitation of its picture was that of competition or interference from Nebenzal. It therefore demanded and received from Nebenzal contractual assurances that he would not interfere with the exhibition of

"Mayerling" at any time and would not compete with it in certain countries. It was entitled to rely on those assurances.

Another risk confronting plaintiff was the possibility of its not securing an extension of the Anet rights. War conditions made it impossible to secure that extension at the time the contracts were executed, but Quader-Kino was justifiably convinced that it could secure the extension when communication with occupied Europe was reestablished. The rights were excluded from the grant of the remake rights but were covered by a simultaneously executed supplemental agreement. Nebenzal was given the option to acquire "those rights to the extent the Owner [Quader-Kino] owns them itself" and it was agreed that if he exercised the option Quader-Kino would use its best efforts to secure their extension. The supplemental agreement makes it plain that if Nebenzal purchased the Anet rights "to the extent the owner owns them himself" or if plaintiff acquired an extension of the rights for Nebenzal, they were to be held for their mutual benefit. "Under all circumstances, and without having to make any contribution to the price to be paid to the heirs of Claude Anet for the extension of the rights, [Quader-Kino] shall be entitled to the use and exploitation of the rights dealt with herein for its own purposes in accordance with the reservations made in the agreement signed simultaneously, and those reservations are hereby expressly made part of this agreement." It is true that Nebenzal did not agree not to purchase the rights independently. He knew, however, that the Anet rights would soon expire and that plaintiff's reservation of the unqualified right to exploit the picture and the limitation on the exhibition of the English remake would be valueless to plaintiff unless an extension of the Anet rights was obtained.

The negotiations for the sale of the remake rights were begun when Hitler's European fortress had been dented only at Salerno and the cessation of hostilities seemed remote. When the contracts were executed the Allied armies were still contained in the Cherbourg Peninsula and had not penetrated farther east than St. Lo. It would have been absurd at that time to contract so carefully about rights that would expire shortly and would have no value before their expiration. The Anet rights at that time had only 14 months to run. The exhibition of "Mayerling" in continental Europe before October 8, 1945, was virtually impossible. It is hardly conceivable that plaintiff would have insisted on reserving rights that would be virtually useless to it. The contracts have

meaning only if they are construed as providing for the acquisition of the Anet rights for the mutual benefit of Quader-Kino and Nebenzal.

The supplemental agreement was based on the understanding that Quader-Kino would eventually secure an extension of the Anet rights. Nebenzal was given the opportunity to share in those rights by paying the costs that Quader-Kino would incur in their acquisition. Nebenzal in turn agreed that "Under all circumstances, and without having to make any contribution to the price to be paid to the heirs of Claude Anet for the extension of the rights," Quader-Kino would be entitled to their concurrent use. These mutual obligations are clear even without express words of promise. (*Atwater & Co.* v. *Panama R. R. Co.*, 246 N.Y. 519, 524 [159 N.E. 418].)

Although it is true that Nebenzal did not expressly agree not to purchase the rights independently and use them to prevent plaintiff's exploitation of its picture, "we think . . . that such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation' imperfectly expressed." (Cardozo, J., in *Wood* v. *Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91 [118 N.E. 214]; *Moran* v. *Standard Oil Co. of New York*, 211 N.Y. 187, 197-198 [105 N.E. 217]; *Murphy* v. *North American Light & Power Co.*, 106 F.2d 74, 80-81; *Coghlan* v. *Stetson*, 19 F. 727, 730; *De Cesare* v. *Occhiuto*, 64 N.Y.S.2d 675, 677; *McCall Co.* v. *Wright*, 133 App.Div. 62, 68 [117 N.Y.S. 775].) The contracts carry the inescapable implication that the parties contemplated that the extension of the Anet rights would be secured for their mutual benefit. New York law, in such cases, implies in the contract a "covenant of good faith and fair dealing," that neither party shall take any action that may destroy or impair the right of the other party to receive the anticipated fruits of the contract. (*Kirke La Shelle Co.* v. *Paul Armstrong Co.*, 263 N.Y. 79, 87 [188 N.E. 163]; *Underhill* v. *Schenck*, 238 N.Y. 7, 15 [143 N.E. 773, 33 A.L.R. 303]; *Price* v. *Spielman Motor Sales Co.*, 261 App.Div. 626 [26 N.Y.S.2d 836, 839]; *Genet* v. *Delaware & Hudson Canal Co.*, 136 N.Y. 593, 608, 611-612 [32 N.E. 1078, 19 L.R.A. 127]; *Uproar Co.* v. *National Broadcasting Co.*, 81 F.2d 373, 377; *Frohman* v. *Fitch*, 164 App.Div. 231 [149 N.Y.S. 633, 634]; *Goldberg, 168-05 Corp.* v. *Levy*, 170 Misc. 292 [9 N.Y.S.2d 304, 306]; *Guardino Tank Proc. Corp.*

v. *Olsson,* 89, N.Y.S.2d 691, 696-697; *Bennett* v. *Vansyckel,* 4 Duer (N.Y.) 462, 472.) Nebenzal breached that implied covenant when he purchased and used only for his own purposes rights in which both parties were given a concurrent interest.

The majority opinion states that "plaintiff . . . received 'the fruits of the contract' in the form of the $20,000 paid it by Nebenzal; so far as Nebenzal's contractual obligations to plaintiff are concerned Nebenzal had by such payment performed his part of the contract and nothing further remained to be done." That statement overlooks the fact that the reservation of Quader-Kino's "unqualified right" to continue the exploitation of its picture was part of the consideration in addition to the $20,000 paid for the grant of the remake rights. Moreover, the New York courts include as "fruits of the contract" any benefit that either party expects to derive from the subject of the contract when that expectation appears from its terms. Rights reserved under a contract of license or sale are as much the fruits of that contract as rights initially created thereunder. (*Manners* v. *Morosco,* 252 U.S. 317, 327 [40 S.Ct. 335, 64 L.Ed. 590]; *Harper Bros.* v. *Klaw,* 232 F. 609, 613; *Uproar Co.* v. *National Broadcasting Co.,* 81 F.2d 373, 377.) Thus, plaintiff reserved as fruits of its contract with Nebenzal the unqualified right to continue the exploitation of "Mayerling" and the right to use the Anet rights for that purpose. Nebenzal impliedly covenanted not to do anything to impair the value of those rights. He breached the covenant, not when he purchased the Anet rights but when he used those rights to restrain plaintiff's exhibition of its motion picture.

The facts of this case are analogous to those of *Bennett* v. *Vansyckel, supra,* 4 Duer (N.Y.) 462. Defendant therein assigned a lease for a term of years to the plaintiff. At its expiration, defendant obtained a new lease from the lessor to the exclusion of his assignee. The court decreed that defendant held the new lease as a constructive trustee for the benefit of the plaintiff, on the ground that defendant breached his implied covenant of fair dealing by acting adversely to plaintiff's expectation that he would obtain a renewal of the lease for his own benefit. By the same reasoning, Nebenzal clearly breached his implied covenant not to secure and use adversely to plaintiff, rights that both parties contemplated plaintiff would attempt to secure for their mutual benefit.

the New York cases is not justified by its statement that "as found by the trial court, there is no evidence of any but fair and honest dealing on [Nebenzal's] part." If in fact a contract has been breached, the good faith of the defendant or his belief in the legal rectitude of his action is immaterial. The requirement of fair dealing, as the New York court has specifically held, is not dependent upon the presence or absence of intentional bad faith. The gravamen of a plaintiff's cause of action is the fact that its contractual expectations have been destroyed, and not the intention with which defendant has destroyed them. (*Bennett* v. *Vansyckel*, 4 Duer (N.Y.) 462, 472; *Kirke La Shelle Co.* v. *Paul Armstrong Co.*, 263 N.Y. 79, 89 [188 N.E. 163]; *Harper Bros.* v. *Klaw*, 232 F. 609, 613; *Ward* v. *Whitney*, 8 N.Y. 442, 446.) The converse result reached by the majority opinion can be supported only if the applicable New York law is disregarded; that cannot be done in view of the express provision that New York law should govern "all questions relating to the construction, enforcement and performance" of the contracts. (*Boole* v. *Union Marine Ins. Co.*, 52 Cal.App. 207, 209 [198 P. 416]; *Mutual Life Ins. Co.* v. *Cohen*, 179 U.S. 262, 267 [21 S.Ct. 106, 45 L.Ed. 181]; *Duskin* v. *Pennsylvania-Central Airlines Corp.*, 167 F.2d 727, 730; *Hurwitz* v. *Hurwitz*, 216 App.Div. 362 [215 N.Y.S. 184, 189].)

The majority opinion seeks to justify its interpretation of the contract on the ground that " 'this court will adhere to the interpretation placed by the trial court on the writings and the conduct of the parties.' " The interpretation of a contract or other written instrument, however, if there is no extrinsic evidence thereon or if the evidence is without conflict and not susceptible of conflicting inferences, is a question of law, and the finding of the trial court thereon is not conclusive on appeal. (*Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825]; *Jones* v. *Pollock*, 34 Cal.2d 863 [215 P.2d 733]; *Western Coal & Mining Co.* v. *Jones*, 27 Cal.2d 819, 826-827 [167 P.2d 719, 164 A.L.R. 685]; *Union Oil Co.* v. *Union Sugar Co.*, 31 Cal.2d 300, 306 [188 P.2d 470]; *Trubowitch* v. *Riverbank Canning Co.*, 30 Cal.2d 335, 339 [182 P.2d 182]; *Brant* v. *California Dairies, Inc.*, 4 Cal.2d 128, 133 [48 P.2d 13]; *Estate of Norris*, 78 Cal.App.2d 152, 159 [177 P.2d 299]; *Estate of O'Brien*, 74 Cal.App.2d 405, 407 [168 P.2d 432]; *First Trust & Savings Bank* v. *Costa*, 83 Cal.App.2d 368, 372 [188 P.2d 778].) The only evidence the majority opinion

invokes to support the trial court's erroneous interpretation is the testimony of Nebenzal that he did not want the Anet rights and that he signed the supplemental agreement under the impression that "it was an option, which I felt I could pick up or not pick up." Conceding that the trial court could believe Nebenzal's statement that he did not want the Anet rights in view of his payment of more than $10,000 for them six months later, I find nothing in his testimony to indicate that the parties gave the third clause of the agreement any construction other than its patent implication. The agreement was in part an option, as Nebenzal stated; nonetheless by signing it he bound himself to its provisions, including their express recognition of Quader-Kino's intention to continue exhibiting the old picture under an extension of the Anet rights and the protection of its interest in those rights. Nothing in the testimony casts doubt on the clear agreement in the main contract on Quader-Kino's reservation of rights. Finally, even if Nebenzal's testimony disclosed a secret intention not to be bound by that agreement, that intention is irrelevant. "It is now a settled principle of the law of contract that the undisclosed intentions of the parties are . . . immaterial; and that the outward manifestation or expression of assent is controlling." (*Brant* v. *California Dairies, Inc.*, 4 Cal.2d 128, 133 [48 P.2d 13]; 1 Rest., Contracts, § 20.)

I would therefore reverse the judgment and remand the cause with directions to the trial court to grant the injunction as prayed and to determine the amount, if any, of damage suffered by Quader-Kino as a result of Nebenzal's breach of their contract.