[S. F. No. 16763.   In Bank.   Oct. 6, 1943.]

WILLIAM J. CITRON, Respondent, v. J. J. FRANKLIN, Appellant.

48

B. E. Kragen, George Olshausen, Lionel B. Benas and Keyes & Erskine for Appellant.

Clarence A. Linn for Respondent.

THE COURT.—A petition for hearing in this case was granted to the end that further consideration be given to the contentions of the appellant. On such consideration we agree with the disposition of the appeal by the District Court of Appeal of the First Appellate District, Division Two, and adopt as the opinion of this court the opinion of that court prepared by Justice Spence, with the modifications that hereinafter appear.

"Plaintiff sought to recover upon a contract. The cause was tried by the court sitting without a jury and plaintiff had judgment against defendant J. J. Franklin in the sum of $2646.33.'' Defendant appeals from the judgment.

"Plaintiff had been engaged for many years in purchasing and booking motion pictures for use in the Hawaiian Islands. Defendant had been engaged for many years in exhibiting motion pictures. In 1934, defendant conceived the idea of organizing a corporation in the Hawaiian Islands and of forming a chain of motion picture theatres there together with a film exchange. In pursuance of this idea, defendant negotiated with plaintiff and, as a result of the negotiations, two written contracts were entered into on the same day, July 20, 1934.

"One of said contracts, attached to the complaint as Exhibit B, purported to be entered into between plaintiff and the corporation which had not then been organized. It was called a 'Purchasing Agency Agreement' and plaintiff was thereby employed by the corporation to act as its purchasing agent. It further provided that plaintiff should be elected vice-president of the corporation 'as soon as same may be conveniently done.'

"The other of said contracts, attached to the complaint as Exhibit A, was entered into by plaintiff and defendant personally. This is the contract upon which the present action was based. It recited that defendant was the owner of all the stock of the corporation, that plaintiff was the purchasing agent thereof and that defendant desired to grant plaintiff the option to purchase 25 per cent of all the stock owned by defendant. It was then agreed as follows:

" '1. That first party does hereby give and grant unto second party an option to purchase not more than twenty-five per cent (25%) of all the stock owned and held by first party in the Franklin Theatres Enterprises, Inc., a corporation.

" '2. That the purchase price to be paid by second party upon the exercise of the aforesaid option shall be computed upon the amount of money or other consideration which first party has advanced and paid into the said corporation upon the date that the said option shall be exercised.

" '3. It is distinctly understood and agreed that the aforesaid option shall remain in force for a period of one year from the date of the execution of this agreement, it being understood in this respect, however, that first party shall in no way be precluded from selling or disposing of the said stock to persons other than second party, provided, however, that second party shall share the proceeds from the sale of said stock as is provided hereafter.

" '4. It is distinctly understood that in the event first party shall sell his stock in the aforesaid corporation to any one other than second party prior to the exercise by second party of his option, then and in that event first party agrees to pay unto second party ten per cent (10%) of all monies and other consideration realized by first party over and above the amount of money and other consideration which first party has paid for the aforesaid stock or has advanced to the said corporation.'

"After entering into these contracts, defendant went to the islands and acted as the head of the new venture while plaintiff remained on the mainland and acted as purchasing agent. The corporation was formed, it prospered and defendant finally sold his stock on May 31, 1937, before plaintiff had exercised his option to purchase the stock but during the

extended time for the exercise of the option as found by the trial court.

"There was but little conflict in the evidence. Such conflict as there was relating to the sale price of the stock and the amount which defendant had paid into the corporation was resolved by the trial court in favor of defendant. The sale price was found to be $30,000 and the amount paid in by defendant was found to be $3536.61. The trial court gave plaintiff judgment for 10 per cent of the difference between these amounts. On this appeal the findings concerning these amounts are not challenged.

"Defendant first contends that the trial court erred in imposing any liability upon him as the trial court found that plaintiff never exercised his option. The trial court found, however, that the option had been extended from time to time up to and including the time of the sale on May 31, 1937. Assuming for the moment that this latter finding was sustained by the evidence, we find no merit in defendant's contention. The intent and purpose of the parties appears entirely clear and unambiguous from a reading of the option agreement. Plaintiff desired and the agreement granted to him an option to purchase 25 per cent of all stock owned by defendant. Defendant desired to retain and the agreement reserved to him the privilege of selling all of his stock to others at any time. The agreement then provided that in the event defendant sold his stock to others 'prior to exercise by second party of his option,' defendant would pay to plaintiff 10 per cent of the amount received on such sale over and above the amount which defendant had paid into the corporation. It is apparently defendant's claim that plaintiff was not entitled to the benefit of the last mentioned provision upon the sale of the stock but only in the event that plaintiff exercised the option after the sale had taken place. He stresses the words 'prior to the exercise by second party of his option' and claims that those words cannot be construed to mean 'during the life of the option.' In other words, defendant urges a construction under which plaintiff would have been required to go through the formality of exercising his option to purchase the stock after defendant had sold all of his stock to others and at a time when defendant was no longer in a position to sell any stock to plaintiff. Such a construction is wholly unreasonable. The law does not

require idle acts (Civ. Code, sec. 3532) and the clear intention of the parties, as evidenced by the terms of the agreement, was that plaintiff was to be entitled to the benefit of the 10 per cent provision immediately upon the sale to others at any time during the life of the option.''

■ Defendant also contends that the court erroneously sustained objections to questions put to plaintiff on cross-examination, claiming that defendant was thus prevented from proving that plaintiff understood that he had to accept his option as a condition precedent to claiming rights in the proceeds from the sale. Objections were sustained to the first and third of the following questions: ''You understand, Mr. Citron, that you were to receive ten percent of Mr. Franklin's net profit upon the sale of stock he held in this corporation?'' ''You knew, did you not, that Mr. Franklin sold 62½ per cent of his stock to Mr. Rosen?'' ''What did you understand you were to receive from the balance of the 37½ per cent under your agreement?'' These questions were concerned with the proportion of the proceeds that plaintiff understood he was entitled to receive under the contract and had no bearing on the issue whether plaintiff was required to exercise the option. In any event, they were directed, not to the interpretation that the parties placed upon the contract, but simply to the subjective understanding of one of the parties. (*Brant* v. *California Dairies, Inc.,* 4 Cal.2d 128, 133 [48 P.2d 13].)

■ ''Defendant further contends that the evidence was insufficient to support the trial court's finding 'That the terms of said agreement, Exhibit A, were extended from time to time and up to and including the date of which defendant, J. J. Franklin, sold all of his capital stock in the Franklin Theatrical Enterprises, Ltd., to Adolph Ramish, to wit: May 31, 1937.' The evidence on this issue is quite voluminous and includes both letters and conversations. Neither the writing of the letters nor the making of the oral statements was denied by defendant. We need refer only to some portions of these letters and statements.

''The written agreement was made on July 20, 1934, and, by its terms, the option was to remain in force for one year. After executing the agreement, defendant spent most of his time in the islands while plaintiff spent most of his time on the mainland. At an early date, two men, Ramish and Rosen,

had also become financially interested in the venture, Mr. Ramish being made president and Mr. Rosen a vice-president of the corporation. On May 23, 1935, and before the expiration of the one year, plaintiff wrote to defendant, 'I informed him (Rosen) I was ready to put up my end of it and I presume either you or he will call on me shortly to cover my 25% interest. Am glad everything is going along fine. Feel confident the four of us will be on the easy side of the street.' On May 31, 1935, defendant replied: 'Regarding your interest you need not worry about that in the least. Whenever you are ready, you will make the deal with me as I suppose you know that my word is as good as a bond even if you didn't have a contract. . . . We all of course, are directors. I am glad that you realize that we are on the way and that we are almost reaching the goal we set out to reach. I am not forgetting for one moment, regardless of what you say I accomplished, the fine work that you did and without which I could not have accomplished what we did so far. A company with four men with experience that we have had must go places. We have everything in our favor.'

"On June 6, 1935, plaintiff again wrote defendant: 'You may be assured that I have the utmost confidence in what you say and when you come to the mainland we can arrange all matters pertaining to my interest with the company.' On July 5, 1935, defendant wrote plaintiff, 'I have been held up here because of the many changes that we have had to make in the plans of the King Theatre but hope to get away very shortly and then we will be able to get together with you on your contract. . . . I cannot forget your loyalty throughout the storm, and I want to say to you that I am happy to have you as one of my partners.'

"Defendant did not come to the mainland as soon as expected and on September 25, 1935, he wrote plaintiff: 'As I told you in previous correspondence that my word is as good as any bond and that I would live up to my agreement with you. . . .' On November 7, 1935, plaintiff wrote defendant: 'I would like to know what amount of your stock and interest you would want me to take and just what it would cost me in round numbers? Of course, you know that I am not a man of means and have very little cash that I can place my fingers on.' On November 14, 1935, defendant wrote plaintiff: 'Regarding the stock, when you are out here (Honolulu) we will discuss that matter further. We had an understand-

ing and when you come here we will discuss it further. When you see what we have here you will realize the opportunity.'

"In December 1935, plaintiff, Rosen and Ramish visited Honolulu and conferred with defendant. Plaintiff's testimony of the conversations then held and subsequently held concerning the option was corroborated by Rosen and was not denied by defendant. Plaintiff said, 'How about my end of it? I want to take up my option.' Defendant said, 'We are too busy. I can't talk now. You don't have to worry. My word is my bond. You can come in any time you want.' When plaintiff asked for the information concerning the amount defendant had invested, defendant told him that he was 'very, very busy,' that it was the 'wrong time' to talk about it but that he would give him the information in the 'very near future.'

"In 1936, defendant came to the mainland and conferred with plaintiff, Rosen and Ramish. The subject of the option was again discussed. It will be remembered that the unchallenged finding of the trial court shows that defendant had paid into the corporation only $3536.61. In their conversations, plaintiff said: 'Jack, now that you are here from Honolulu, I want to know definitely how much I am to put up for my option of twenty-five per cent. Tell me what it is.' Defendant said 'Listen, I put up $42,000 of my own money.' Both plaintiff and Rosen took exception to this figure, plaintiff saying it was 'ridiculous' and Rosen saying 'You haven't got that kind of money.' Plaintiff asked defendant for a statement of the amounts advanced but defendant 'put it off' saying, 'I am too busy. I have to go back to the islands.'

"The correspondence continued after defendant's return to the islands but the tone of the letters gradually became less cordial. On October 16, 1936, defendant wrote to plaintiff, 'Consolidated are now very anxious to make a deal along the lines we discussed and if our partners will not be thinking only of themselves we will come out with flying colors. Everything points to success.' On the same day, plaintiff wrote to defendant: 'As you must know, had you given me the exact amount you put into the theatre project, as now appears on the books of the company, I certainly would have handed you my check and I feel confident I could have put over a deal you now have in mind. You have always informed me that you had invested. At one time you told me $32,000,

at another time $40,000. Both Mr. Ramish and Mr. Rosen on several occasions, informed me that you had been credited with $15,000 on the company's books. So you see, Jack, my reason for hesitating. You assured me many times that I could come in any time I desired. That your word with me was always good and that whenever I was ready I could come in. I have always been ready but the above held me back.'

"Defendant replied on November 11, 1936: 'As to what Ramish says I have invested, he can say what he likes, the books will show I invested over $41,000.00 and not $15,000.00 as he says. The statement I gave you some time ago was made out by Mr. Turner, in that one it was $32,000.00, but I have since shown that it is $41,000.00.' On December 14, 1936, defendant again wrote: 'Regarding Mr. Ramish's statement of what I invested, it does not interest me in the least for it is contemptible falsehood. I showed you my investment, made up by Mr. Turner, from my invoices. Since then other invoices were given to Mr. Turner which made it $42,000, but that is neither here nor there. Our deal was not predicated on what I invested. You have certainly had every opportunity to come in but so far you never took advantage of it. It would be ridiculous to base the business on the amount of money Mr. Ramish suggests. My books speak for themselves.'

"On January 5, 1937, defendant wrote: 'I always told you I would take care of you, meaning that you would not have to take up your stock according to the time limit in your contract, but if we should sell the business and you have not taken up your stock by that time you certainly couldn't expect me to close with you at such time . . . you have the same opportunity today that you had when we signed the contract, but it must be exercised before a sale of the business is made, otherwise same will not be recognized by me.' Plaintiff replied on January 25, 1937: 'For a long time past, Jack, I have been willing and anxious to take up the option according to our agreement. I asked you for a statement of the amount invested by you so that I would know the amount of my prorata, but was unable to get a clear, definite statement. If you will give me an exact statement of the amount invested in the company by you, I will act on the option as soon as I can verify your statement. As

you know, I have not access to the books and must depend on the officers of the company to furnish me the figures.' Defendant replied to this letter on February 3, 1937: 'Regarding the stock again I don't know how I could make myself clearer than I have in my last letter, no one in the world could ever accuse me of ever taking advantage of anyone or ever breaking my word. Ramish and Rosen have nothing whatsoever to do with our transaction and again let me advise you that I do not care what either of them say I invested, because whatever they say in this respect is not the facts. However, what I invested in the business has nothing whatever to do with our contract, but let me again remind you that I handed you a statement made out by Mr. Turner while he was in L. A. of all expenditures I had made and that amounted to $38,000.00. I again explained to you that I gave them additional $8000.00 worth of bills when Turner came to Honolulu, but in a thousand years, you, nor anyone else, will be able to make out his books the way he has them set up now. . . . How then, can you ever expect to get any proper figures even if you should want them from him. As per the contract which I made with you, which stated that you could come in on twenty-five per cent of my holdings, none can say that you have offered to take up your option and that I refused it, but circumstances occur where options cannot last forever, because of certain conditions. Therefore, I again say that although your option ran out, you can take advantage of the opportunity providing you take it immediately, otherwise you cannot expect me to feel any further obligation in the matter as I have been more than fair in this entire transaction. You realize that a sale of the business may be made any day or a deal may be made that requires quick action and unless you have made your investment before that time, you can't expect me to hold up deals as that is asking too much.' On February 18, 1937, plaintiff replied: 'Note what you say regarding the option. Just as soon as I can get the necessary data be assured Jack I want to take advantage of the option you have extended me.'

"Defendant apparently concedes, at least for the purpose of argument, that the time for the exercise of the option was extended but claims that the evidence was insufficient to support the finding that the time was extended to and including the time of the sale on May 31, 1937. It is argued

that the extension was for an unspecified time, that it therefore covered only a reasonable time and that a reasonable time expired prior to May 31, 1937. Defendant further argues under a separate heading that the evidence was insufficient to support the finding that the extension was based upon a good and sufficient consideration. Plaintiff argues that the time provision for the exercise of the option was waived by both written and oral agreements for extensions based upon good and sufficient consideration and that defendant, by his fraudulent conduct, prevented the exercise of the option and was estopped. In the reply brief, defendant argues that as neither prevention of performance nor estoppel was pleaded, plaintiff may not rely thereon.

"As we view the situation, many of these contentions need not be considered here for the reasons hereinafter stated. The action was one upon an option agreement which was admittedly made upon a good and sufficient consideration. It was executed contemporaneously with an agreement for the employment of plaintiff by the corporation as its purchasing agent. Plaintiff served in that capacity with the corporation until the time of the sale and continued to serve thereafter. The option agreement provided that the option price should be computed upon the amount which defendant had paid into the corporation. No method was provided by the express terms of the agreement to enable plaintiff to determine the amount which defendant had so paid. We therefore believe it necessary, in order to make the agreement reasonable, to read into the agreement the implied terms that defendant would furnish plaintiff with accurate information concerning that amount at any time that plaintiff expressed his desire to exercise said option during the life thereof and that any delay on the part of the defendant in furnishing such information would extend the life of the option until a reasonable time after such information had been furnished by defendant. (Civ. Code, sec. 1655.) If these terms were not implied terms of the agreement, then plaintiff would have had no way of determining (1) whether it was desirable to exercise the option or (2) the amount to be tendered to defendant in the exercise thereof.

"Under the express terms of the option agreement, the life of the option was from July 20, 1934, to July 20, 1935. The evidence shows that plaintiff expressed his desire to exer-

cise the option as early as May 23, 1935, in a letter written to defendant on that date. Thereafter plaintiff reaffirmed his desire to exercise the option on numerous occasions and made repeated requests to defendant to furnish him with the necessary information. No accurate information was furnished to plaintiff by defendant at any time. For some period of time after May 23, 1935, and despite repeated requests by plaintiff, defendant gave no information whatever concerning the amount but gave plaintiff the broadest assurances that his option could be exercised at any time. Thereafter defendant grossly misrepresented the amount which he had paid into the corporation, insisting that he had paid into the corporation approximately ten times the amount which he had actually so paid. Plaintiff took exception to these misrepresentations and reaffirmed his desire to exercise his option upon the basis specified in the option agreement. In his letters of December 14, 1936, and February 3, 1937, defendant denied that the amount that he had actually invested in the corporation had anything to do with the exercise of the option thereby repudiating the terms of the option agreement. In the first of said letters he stated 'My books speak for themselves' indicating that he considered the parties bound by the figures shown by the books. In the second of said letters, he repudiated the figures shown by said books. The only conclusion that can be drawn from the admitted facts is that defendant, through fraudulent representations, endeavored to gain an unconscionable advantage over plaintiff either by persuading plaintiff to refrain from exercising a valuable option or by obtaining from plaintiff thousands of dollars to which defendant was not entitled in the event that plaintiff did exercise said option. In any event, the uncontradicted evidence shows that defendant wholly failed to furnish plaintiff with accurate information at any time, and under our view of the implied terms of the option agreement, the life of the option was thereby extended at least to and including the time of the sale as found by the trial court.''

The judgment is affirmed.

Appellant's petition for a rehearing was denied November 4, 1943.