Filed 5/5/21  Marriage of Linett CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re the Marriage of BARBARA and DANA LINETT. | D075178 |
| BARBARA LINETT, Respondent, v. DANA LINETT, Appellant. | (Super. Ct. No. D545205) |

APPEAL from a judgment of the Superior Court of San Diego County, Gerald C. Jessop, Judge.  Affirmed.

Dana Linett, in pro. per., for Appellant.

Law Offices of Beatrice L. Snider and John L. Romaker for Respondent.

Dana Linett (Husband) and his former wife Barbara (Wife) entered into a Marital Settlement Agreement (MSA) awarding most of the community property to Husband, and requiring him to pay $2.8 million in an equalization payment.  About 10 months after the MSA was incorporated into

a final judgment, Husband moved to set aside the judgment, claiming he made a unilateral mistake in believing he could pay the $2.8 million in property, rather than in cash.  (Fam. Code, § 2122, subd. (e).)[1]

After a nine-day trial, during which Husband testified for about six days, the court found Husband did not meet his burden of proof on the issue and denied the motion.  Husband appeals.  We affirm.  The court's ruling was supported by the factual record and governing law.

FACTUAL AND PROCEDURAL SUMMARY

*Background*

Husband and Wife were married in 1991.  During their marriage, the couple operated two businesses out of their home.  The businesses involved buying and selling historical (early American) collectibles.

One of the businesses (referred to as EAN) owned collectibles and the other business (referred to as EAHA) operated as an auction-consignment entity selling collectibles.  The couple also owned many collectible items in their personal collection (the parties disputed whether some of these items were Husband's separate property).  Husband is a well-regarded national expert in historical collectibles with a detailed knowledge of the items held by the couple.  Wife mainly performed administrative work for the businesses.

The couple's Rancho Santa Fe home was valued at between $3.5 and $4 million, with about $1.5 million in equity after subtracting the various encumbrances.  The home contained many custom features allowing the couple to operate the collectibles businesses out of their home (such as a specially-built vault).

The couple separated in September 2013 when Wife filed for dissolution.

---

[1]    All unspecified statutory references are to the Family Code.

2

After acrimonious disputes over a proper property division and spousal support, the parties participated in a mediation on December 3, 2014. At the time, the parties had not determined the value of the community estate for various reasons, including the inherent difficulty of valuing the collectibles held by the parties and businesses.

During the mediation, Husband was assisted by his family law attorneys, his business attorney, and a long-time EAN employee. Wife was assisted by her family law attorneys. At the end of the day, they agreed on settlement terms, and during the next several weeks exchanged several drafts and then reached a more formal agreement (the MSA).

The MSA gave Husband title to almost all the property, including the EAN and EAHA businesses (and two other businesses), the Rancho Santa Fe home, and the business and personal collectibles. In exchange, Husband agreed to pay Wife an "equalization payment" of $2.8 million in installments over six years. Under the MSA, all of the collectibles would be immediately released to Husband except for items referred to as the "John Ford collection," which would be placed in a safe deposit box to be used as security if Husband did not satisfy his payment obligations.

Section 14 of the MSA contained the equalization payment obligations and security provisions, and stated in part:

> "A. . . . Husband *shall pay Wife the sum of $2,800,000.* This equalization payment is intended to be a tax free interspousal transfer [for federal and state tax purposes]. The equalization payment shall be paid as follows:
>
> "(1) $100,000 shall be due and payable to Wife within 90 days of the date Wife executes this Agreement.
>
> "(2) $600,000 shall be due and payable to Wife by September 1, 2015, [and] shall be made payable by Husband to [Wife's attorney's office].

3

"(3)  $200,000 shall be due and payable to Wife by September 1, 2016, [and] shall be made payable by Husband to [Wife's attorney's office].

"(4)  Beginning March 1, 2017, and ending September 1, 2020, $200,000 shall be due and directly payable to Wife every six (6) months (i.e., on March 1st and September 1st of every year), for a total of eight (8) installment payments.

"(5)  A final installment payment of $300,000 shall be due and payable to Wife on March 1, 2021." (Italics added.)

The MSA imposed a 10 percent penalty if Husband "is ever late on any one" payment. Additionally, if Husband defaulted on any equalization payment, Wife had the right to trigger a sale of the Rancho Santa Fe residence. The equalization payment was also secured by "Husband's complete John Ford collection." Regarding this security, the MSA provided that Husband had the right to sell "any or all of the John Ford Collection items" subject to certain conditions, including the following: "No assets from the John Ford collection items shall be sold by Husband *if Husband is not current on the equalization payments*, until such time as Husband has made the sixth equalization payment to Wife . . . . After payment of the sixth equalization payment to Wife, Husband may sell . . . the John Ford collection items even if he is not current on the equalization payments . . . ." (Italics added.)

The MSA also required Husband to pay Wife $5,000 in monthly spousal support, with payments terminating "upon Husband's full satisfaction of the equalizing total payment set forth in Section 14 . . . ."

The MSA contained several provisions in which the parties acknowledged they were reaching agreement without determining the extent of the community estate or the value of community property assets, and they understood the property division may not be equal.

4

On December 21, 2014, the parties signed the MSA. The next week, on December 29, the court entered a judgment of dissolution incorporating the MSA (Judgment).

*Performance of the Agreement*

Shortly after, the collectible items were released to Husband, except for the John Ford collection (valued by Husband at about $1 million) which was placed in a new safe deposit box to be used for security under the MSA terms. Husband continued to live in and hold title to the Rancho Santa Fe home, and continued to own and operate the businesses.

Husband paid the first installment by check ($100,000).

On September 1, 2015, $600,000 was due under the MSA. On that date, Husband delivered to Wife's attorney a $60,000 check and a box of collectible items. Wife immediately rejected this tender as not complying with the agreement.

Shortly after, Wife moved for a court order clarifying that the MSA required the equalization installment payments in cash, not property. Husband opposed the motion, and alternatively moved to set aside the Judgment and the MSA based on mistake.

*Hearing On Wife's Motion for Clarification*

The parties stipulated that a privately compensated temporary judge, retired San Diego County Superior Court Commissioner Alan Clements, would resolve Wife's motion. (See Cal. Rules of Court, rule 2.831.) After a three-day evidentiary hearing, Commissioner Clements issued a written "final" order, determining the MSA's plain language required payment in cash, and rejecting Husband's argument the agreement entitled him to satisfy his $2.8 million equalization obligation by tendering tangible property. Commissioner Clements found: "[T]he parties never had an

agreement nor understanding between themselves for [Wife] to accept assets as opposed to cash."

Commissioner Clements stated, however, he recognized Husband "present[ed] genuine concerns about his understanding as to how the payments could be made, and genuine concerns regarding the viability of the business if the Court requires cash payments and does not allow asset payments. His concerns are those regarding his mistakes in signing the MSA without clarification as to how the payment could be made, *and are clearly the subject of his pending motion to set aside the judgment on the MSA based upon unilateral mistake.*" (Italics added.)

Husband appealed Commissioner Clements's order but the appeal was dismissed when he did not file an opening brief.

*Trial on Husband's Claimed Unilateral Mistake*

Husband's motion to set aside the Judgment was then heard in superior court, with Superior Court Judge Gerald Jessop presiding. Although the parties initially estimated a three-day trial, the trial took nine days and primarily concerned Husband's claim that he made a "mistake" in signing the MSA because he subjectively believed he could satisfy the equalization payment with "in-kind" property.

At the outset of the hearing, the parties' counsel discussed the scope of the issues presented for the court's resolution. Both counsel agreed Commissioner Clements had found the equalization payment must be paid in cash (rather than an in-kind property transfer) and Commissioner Clements's order was a "final order" on this issue. Husband's counsel acknowledged this determination was binding on Judge Jessop: "There's no question about that. [Commissioner Clements] already made [this] finding. [¶] . . . This hearing before him was clarification of [the MSA's] language. [Commissioner

6

Clements] interpreted a dollar sign before a numeral to mean that it was cash payment because there wasn't any other language to be clarified. [¶] And there's no question that that's a final order, *and that order cannot be re-litigated.*" (Italics added) Husband's counsel later repeated: "We're not seeking to re-litigate" Commissioner Clements's order, which Commissioner Clements "has ruled . . . is final."

But Husband's counsel said Commissioner Clements's order had left open the issue whether the court should set aside the Judgment based on Husband's claimed *unilateral* mistake because the prior order did not "address[ ] the issue of mistake."

The court agreed with these observations, and confirmed its understanding that the hearing concerned Husband's claim of unilateral mistake in believing he could satisfy his obligations with "in-kind" property. The court said: "The Court will find that [Husband is] collaterally estopped from claiming or presenting evidence as to what . . . [Commissioner Clements] has interpreted the language to mean; specifically, that payments were to be made in cash. However, . . . the issue of [Husband's claimed] unilateral mistake has not been litigated; and consequently, [Husband] may put on evidence regarding his belief of what he was signing at the time."

The court also made clear that it understood Husband brought his petition under section 2122, subdivision (e), which permits a family court to set aside a judgment for a "mutual *or unilateral*" mistake if the mistake was "material." (Italics added.)

During the lengthy trial, Husband testified that when he signed the MSA he believed he could make the equalization payments by transferring collectibles to Wife. He said he interpreted the MSA in this way because he believed the $2.8 million figure in Section 14 represented an "estimated retail

value" or "estimated value range" as that was consistent with how the couple valued collectible items in his businesses. He said his mistake was that he thought the MSA was dividing the "estimated retail value" range of the collectibles.

But Husband had considerable difficulty explaining the meaning of the "estimated" value figures or how they were determined or why he would have mistakenly reached this conclusion. For example, when asked to describe how the estimated-retail-value "figure came into existence," Husband testified: "That's a ballpark figure. Roughly what—the estimate range that we established for the items that we had on a retail basis, between the low estimate and the high estimate, is approximately, you know, for this type of a purpose—ballpark amount . . . ." Another time he responded to the question "what is estimated value range?," by stating: "It's my estimate of what I would hold out should be what somebody might bid on an item with a low estimate and a high estimate range." And when asked what he thought the dollar sign meant in Section 14, he responded that it referred to "value," which he said meant: "The estimate ranges or accumulation thereof, of the items that the community owned." When asked another time for his definition of "value" or "estimate range," he responded: "It's what I'd love to get for the item, price-wise." On another occasion when asked "what does the estimated retail value mean to you?," Husband replied: "That is a . . . value that we would hope to receive on a retail basis, holding out the items to the world, basically."

Husband testified he believed his mistake was reasonable and should require the court to set aside the MSA and Judgment because it would be "impossible" for him to meet the equalization payment if he was required to pay in cash. He said, "There simply doesn't exist enough [collectibles] to turn

8

it into $2.8 million of cash." He claimed he would not have signed the MSA if he thought he had to pay in cash. However, when asked if he was permitted to pay with collectible items, "why would [he] need a 6-year installment plan," Husband responded, "I did not."

Husband additionally said at one point he believed the business collection was worth approximately $6 million as a "ballpark" amount, but later testified this was a "fantasy number" of the amount the couple "hoped the items might be worth." Husband believed the John Ford collection was valued at about $1 million, but claimed this was his "personal" collection.

During trial, Wife strenuously challenged the validity of Husband's claim that he subjectively believed the couple had agreed he could satisfy the $2.8 million payment by transferring property reflecting an "estimated retail value." She testified she did not recall this term was ever used in the parties' presettlement correspondence, and said the phase "estimated retail value" was used in the business to place a value on a consignor's property "so that we could insure it."

Wife said it was clear to her during the mediation that the $2.8 million equalization payment would be paid in cash. She said that although she preferred a three-year deadline for the equalization payments, she agreed to the six-year installment plan "to give [Husband] time to raise the cash." Wife testified that she would never have agreed to permit Husband to satisfy his equalization obligation in assets because (1) "nothing had been valued by an outside party . . . [and] [w]e had no listings [or] outside evaluation of what the market value of our collectibles were"; and (2) there were no MSA provisions ensuring that any transferred property had the value attributed to it by Husband. Wife further testified she insisted on security in the MSA "in the event that [Husband] was unable or unwilling to raise the [necessary]

9

cash." She said the security consisted of the home (which the evidence showed had about $1.5 in equity) and the John Ford collection which she believed was worth about $900,000.

Wife also testified that at the time of the mediation, she believed the community estate was worth approximately $11 million (including the couple's business and community personal collectible items). When asked why she was willing to accept far less than one-half that number as the equalization, she said "I didn't want a long, drawn-out divorce. I wanted it to be over."

Each of the parties also called various witnesses, including accountants and an expert on historical collectibles. The parties were precluded from introducing any evidence of their specific communications during the mediation. (See Evid. Code, § 1119, subds. (a), (c).)

At the conclusion of the evidence, the court stated it had 35 pages of typewritten notes and it "intend[ed] to go through all of those notes before I make [a] decision." The court then heard counsels' arguments, and took the matter under submission.

*Court's Ruling*

About 11 days later, the court held a hearing during which it ruled that Husband did not meet his burden to show the Judgment should be set aside based on his claimed unilateral mistake. The court orally explained its reasoning in detail. The substance of this explanation was later incorporated in a comprehensive statement of decision and a lengthy final order after hearing.

We summarize the relevant findings here.

First, the court had "serious reservations" about the "credibility" of Husband's claim that he did not understand he would be required to pay in

10

cash. The court found Husband never adequately explained the "disconnect" between the MSA's unambiguous language requiring a cash payment and his assertion that the $2.8 million referenced the parties' intent to divide the "estimated retail value" of the parties' collectibles and thus the equalization payment could be paid in property. The court noted that despite Husband's vast business experience, he provided only "disjointed testimony and evidence" to support his "claim of mistake." The court also discussed at length Husband's testimony about the "estimated value range," and the various figures within this range ("low," "high" and "mid-range"), and found this evidence to be of questionable relevance as it relates to "equalization dollars."

The court also noted that Husband had identified $6 million as the value of the business collectibles in the parties' negotiations and in loan applications, but that Husband later said this figure was a "fantasy." The court observed: "[Husband] did not explain why he would have applied an apparent fantasy number to the EAN's inventory or his personal collection [p]articularly if he used that number in applications for credit. [Husband] was represented by two attorneys during the mediation [his family law attorney and his business attorney]. . . . EAN's long-time employee . . . [was] also present. After the mediation, [Husband] had 18 days between the time he entered into the terms of the mediated stipulation settling the matter until he signed the final MSA incorporating the agreement . . . . It stretches credibility to believe that these professionals were using fantasy numbers in considering the terms of the MSA."

After discussing its factual conclusions as to Husband's mistake claim, the court described the applicable law. The court said that Husband's "reliance upon evidence of subjective intent alone is

11

insufficient," and cited to several decisions discussing legal principles requiring an objective (rather than subjective) interpretation of contracts, including *Winet v. Price* (1992) 4 Cal.App.4th 1159 and *Brant v. California Dairies, Inc.* (1935) 4 Cal.2d 128. The court also said that a party's unilateral mistake is generally insufficient to obtain equitable relief from the contract terms if the other party did not know of or cause the mistake. The court additionally said a party bears the risk of mistake if "he has only limited knowledge with respect to the fact to which the mistake relates but treats his limited knowledge as sufficient."

On the separate issue of materiality, the court found Husband "did not satisfy his burden to prove that he would materially benefit if the Court were to set aside the MSA's property division provisions," noting that Husband "never provided to the Court with even an estimated opinion of value of the community property collectibles [when the] Parties entered into the MSA. [¶] . . . [¶] The Court does not know whether [Husband] is complaining that he 'paid too much' or 'didn't give himself enough time to perform' under the terms of the agreement. To this date, no one knows the value of the community property estate or the time it would take to otherwise liquidate the inventory. The court does not know the relative value of the other issues settled by the MSA and 'equalized' by the $2.8 million payable by [Husband] to [Wife]."

Finally, the court rejected Husband's claim that performance was impossible, noting that Husband never made any attempt to perform. The court observed that Husband admitted he could have attempted to sell two of his "high value" coins for a combined $375,000, but did not do so because he did not "believe" he could locate a buyer. The court said that Husband "was very knowledgeable regarding his business and the

12

difficulties regarding sale of collectible assets.  The MSA provided for a pay-out over 6 years apparently in recognition of these difficulties."

On the impossibility argument, the court also found Husband "could have sold the John Ford collection assets which were being held as security for the equalization payment in the [safe deposit box].  [Husband] indicated that he could have raised approximately $1 million towards the equalization payment through the sale of those items.  [Husband] then relied upon circular rationale when he testified that the John Ford collection items became unavailable for sale under the terms of the MSA when they became security.  They became security when he failed to make the second payment.  [Husband's] excuse for not selling the John Ford collection in order to pay the equalization installment was his allegation that the equalization payment was not secured by all items of the John Ford collection.  This does not make sense."

Representing himself on appeal, Husband challenges the court's order denying his section 2122, subdivision (e) set-aside motion.

## DISCUSSION

### I. *Legal Principles and Appellate Review Standards*

A party may move to set aside a family court stipulated judgment on the grounds of "mistake, either mutual or unilateral, whether mistake of law or mistake of fact" if the motion is "brought within one year" after judgment is entered.  (§ 2122, subd. (e).)  "[B]efore granting relief, the court shall find that the facts alleged as the grounds for relief materially affected the original outcome and that the moving party would materially benefit from the granting of the relief."  (§ 2121, subd. (b).)  But a "judgment may not be set aside simply because the court finds that it was inequitable when made, nor simply because subsequent circumstances

13

caused the division of assets or liabilities to become inequitable . . . ."
(§ 2123.)

Under these provisions, a party moving to set aside a judgment under section 2122, subdivision (e) based on a mistake has the burden to show (1) the mistake; and (2) the mistake was material. (See *In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56, 82 (*Kieturakis*); *In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 684-685 (*Rosevear*).) We review the court's ruling for abuse of discretion. (*In re Marriage of Brewer & Federici* (2001) 93 Cal.App.4th 1334, 1346 (*Brewer & Federici*).) In so doing, we consider the court's factual findings under the substantial evidence review standard, and the court's legal conclusions under the de novo review standard. (See *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712; *In re Marriage of Walker* (2012) 203 Cal.App.4th 137, 146.)[2]

In reviewing the court's factual findings, we " 'examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. [Citation.] We accept all evidence favorable to the prevailing party as true and disregard contrary evidence. [Citation.]' [Citation.] 'We do not reweigh the evidence or reconsider credibility determinations. [Citation.]' " (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 34.)

It is a fundamental rule of appellate law that the lower court's judgment is presumed to be correct. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) An appellate court " ' "must *presume* that the record contains evidence to support every finding of fact . . . ." ' [Citations.] It is

_____

2    We reject Wife's argument the substantial evidence standard "does not apply" if a trier of fact concludes a party has not met his burden of proof.

14

the appellant's burden . . . to identify and establish deficiencies in the evidence.  [Citation.]  This burden is a 'daunting' one."  (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.)

## II.  *Unilateral Mistake*

Under section 2122, subdivision (e), a mutual *or* unilateral mistake is sufficient to support a set-aside order, and the mistake can be one of fact or law.  (See *Brewer & Federici, supra,* 93 Cal.App.4th at pp. 1346-1348.)  The code section does not define a "unilateral" mistake, and the courts have not specifically determined the precise scope of this term.  (See *In re Marriage of Varner* (1997) 55 Cal.App.4th 128, 142 ["Less clear is the meaning and the nature of the 'mistake' which permits the setting aside of a judgment."].)  But we agree with both parties that it is appropriate to look to contract law standards for guidance on the meaning of a unilateral mistake under this code section.  (See *In re Marriage of Simundza* (2004) 121 Cal.App.4th 1513, 1518.)

Under California contract law, to establish a basis for relief on a unilateral mistake-of-fact theory, a party may be entitled to relief even if the other party was unaware of the mistake and did not contribute to it.  (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 280-282 (*Donovan*).)  But to prevail under these circumstances, the moving party must establish:  "(1) [he] made a mistake regarding a basic assumption upon which [he] made the contract; (2) the mistake has a material effect upon the agreed exchange of performances that is adverse to the [mistaken party]; (3) the [mistaken party]

15

does not bear the risk of the mistake; and (4) the effect of the mistake is such that enforcement of the contract would be unconscionable."[3]  (*Id.* at p. 282.)

Husband argues the court erred because it never identified or specifically applied these factors, and instead discussed the law applicable to *interpreting* a contract (requiring a focus on objective rather than subjective intent), and stated that "as a general rule" relief for a mistake generally cannot be granted if the mistake was not "known to nor caused by the other party."

There is no showing in the appellate record that Husband's attorneys objected to the court's rulings on this basis.  Thus, the contention is forfeited.  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1132; *Avalos v. Perez* (2011) 196 Cal.App.4th 773, 776.)  But even if Husband had properly preserved the issue, there was no prejudicial error. Read in context, the court's statements were consistent with the elements identified in *Donovan* and the required analysis under section 2122, subdivision (e).  Most important, the court found that Husband did not meet his burden to prove the very first element of the *Donovan* unilateral-mistake test, i.e., that he "made a mistake regarding a basic assumption upon which [he] made the contract." (*Donovan, supra,* 26 Cal.4th at p. 282.)

At trial, Husband argued he made a mistake because he believed the parties had agreed in the MSA he could satisfy his equalization obligation by transferring property to Wife, rather than paying her cash.  The court

---

3    In identifying different elements of a unilateral-mistake claim, Wife relies on *Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410.  This reliance is misplaced.  In *Donovan,* the California Supreme Court limited *Hedging Concepts* to a *mistake-of-law* claim. (*Donovan, supra,* 26 Cal.4th at pp. 279-282.)  In *Donovan,* as here, the issue involved a claimed mistake *of fact*.  Thus, *Donovan* is controlling, and not *Hedging Concepts.*

16

found Husband was not believable on this issue.  The court stated it had "serious reservations" about Husband's credibility regarding the "in-kind" payments.  The court detailed the weaknesses in Husband's evidence and found Husband's testimony as to his mistake to be disjointed and confusing.  Based on these findings, the court found Husband had not proved a "unilateral mistake" that could legally support setting aside the parties' MSA and the Judgment.  Under *Donovan* and section 2122, subdivision (e), this finding required the court to deny Husband's set-aside motion.

In his appellate briefs, Husband expresses disagreement with the court's factual findings.  But we are bound by these findings if supported by substantial evidence (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 93-94), and Husband's challenges to the sufficiency of the evidence are without merit.

First, Husband cannot prevail because he did not fairly and accurately summarize all of the evidence presented at the nine-day trial on the mistake issue.  (*See Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408 (*Rayii*).)  He discussed only the evidence favoring his claims, and failed to explain why the contrary evidence and inferences from this evidence did not support the court's conclusions.

" ' "An appellant challenging the sufficiency of the evidence to support the judgment must [describe] the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law.  [Citations.]  An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient. . . .  Accordingly, a party challenging the judgment for lack of substantial evidence must ' "set forth, discuss, and

17

analyze *all* the evidence on that point, *both favorable and unfavorable*." ' [Citation.]  Unless this is done the error is deemed to be waived." ' " (*Vendor Surveillance Corp. v. Henning* (2021) 62 Cal.App.5th 59, 76-77; see *Verrazono v. Gehl Company* (2020) 50 Cal.App.5th 636, 652-653.)

Moreover, even if we were to reach the issue on its merits, there is ample evidence in the record supporting the court's finding that Husband did not meet his burden to show he subjectively believed the parties had agreed he could satisfy his $2.8 million payment obligation with collectibles in lieu of cash payments.

First, Husband's claim was inconsistent with the circumstances leading to the settlement.  After the parties were unable to agree on a proper valuation of their community property (including the value of each of their hundreds of collectible items), the parties engaged in lengthy settlement negotiations with an experienced family law mediator. Husband (an experienced businessperson) was assisted by his business and family law attorneys and his long-time employee.  The parties' agreement gave Husband most of the community property, and contained unambiguous language requiring Husband to pay an equalization payment in dollars.  Husband then had 18 days to review the agreement until he signed the final MSA.  As reflected in the trial court's findings, if Husband actually believed Wife had agreed he could meet the payment obligation by transferring property to her, it is reasonable to conclude he would have insisted on such language in the agreement.

Additionally, the fact the parties agreed Husband would have six years to satisfy the $2.8 million payment obligation supports that Husband understood the parties were agreeing to pay in cash.  As Husband acknowledged at trial, such extended payment plan would have

18

been unnecessary if he could satisfy the obligation by transferring property.

Further, the court had a reasonable basis to consider that the MSA contained no provisions to value property transferred by Husband to meet his equalization obligations. The parties expressly agreed in the MSA that they had not valued their community property, and there was extended testimony at trial about the difficulty in determining the value of any particular collectible. Under these circumstances, the court had a reasonable basis to decline to credit Husband's claim he actually thought Wife had agreed or would have agreed to accept whatever items he unilaterally selected to compensate her for the $2.8 million payment obligation.

Additionally, the court found Husband's explanation at trial for his claimed mistake—that he thought the parties had agreed to divide "estimated retail value"—undermined the credibility of his mistake claim. As the court noted, Husband's testimony on the "estimated retail value" concept was highly problematic for numerous reasons, including that Husband could not explain the concept with any clarity; there was no specific identified value for each item (at most, there was a low, high, and mid-range "estimated" value); Husband acknowledged the concept referred only to an amount the parties "hoped" to obtain from selling the item; Husband admitted the estimated retail value was not equivalent to fair market value; the parties expressly agreed in the MSA they had *not* placed a value on the community property items or determined the extent of the community estate; and Husband was aware the equalization payment was not only to compensate for the collectibles but also to

19

compensate for the other community property received by him, such as the Rancho Santa Fe residence.

In challenging the court's factual conclusions, Husband discusses his own evidence supporting his unilateral-mistake claim, including that the MSA did not use the word "cash"; it was undisputed that the couple owned primarily property rather than cash; the MSA does not specifically state that Husband will have to sell property to meet his equalization obligation; the fact that Section 14 stated Husband's equalization payments were " 'tax-free' " under the Internal Revenue Code; and Husband's testimony he believes it would have been "impossible" to transform his collectibles into cash during the six-year period.

In asserting these arguments, Husband is asking us to place greater weight on his evidence than did the trial court, something we cannot do. (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1043-1044.) We cannot reverse a court's order merely because there was evidence that could support a contrary finding. (*Ibid*.; *Norasingh v. Lightbourne* (2014) 229 Cal.App.4th 740, 753.) When reviewing an appellate challenge to a court's factual finding, we do not determine whether substantial evidence could have supported a different finding, but only whether substantial evidence supports the finding the trial court actually made. (*Norasingh,* at p. 753; see *Rayii, supra,* 218 Cal.App.4th at p. 1408.)

Husband alternatively argues the court made a legal error in denying his motion because the court did not understand a unilateral mistake alone could support relief under section 2122, subdivision (e). The record does not support this argument. Judge Jessop, a highly experienced family law court judge, expressed an understanding throughout the trial that Husband's motion was brought under section

2122, subdivision (e) and that a "unilateral mistake" could serve as a basis to set aside the judgment if Husband in fact proved the unilateral mistake. Likewise, we find unavailing Husband's focus on the court's statement that a party's subjective belief alone is insufficient to show unilateral mistake. We agree with the court that under the circumstances here Husband was not entitled to relief if he established only that he subjectively believed he could satisfy his payment obligations by transferring property. Rather, the issue was whether Husband subjectively (but mistakenly) believed that he *and Wife* had agreed to this payment plan. We are fully satisfied the court understood these concepts, and as discussed, had substantial evidence to reject this claim.

Husband additionally argues the court failed to "address" tax issues and/or allow the admission of evidence on the relevant tax laws. However, Husband's record citations do not support this assertion. At most, he cites to the court's ruling that he was barred from relitigating the objective meaning of the MSA. However, this ruling was proper and was agreed to by Husband's counsel. (See part IV, *post*.) Further, this ruling did not preclude Husband from presenting evidence as to his claimed unilateral mistake. To the extent Husband believed tax-related evidence was relevant to the issue of his mistake, he was permitted to present this evidence at the hearing, and there is no showing he was precluded from doing so.

Moreover, the court had a reasonable basis to reject Husband's tax-related arguments. Husband argues that requiring him to sell the collectibles and pay Wife in cash was unfair and inconsistent with the parties' agreement because this would require him to solely bear any taxes upon the sale of a collectible (presumably some form of capital gains

21

taxes). Husband maintains that the MSA's provision that his equalization payments were to be a "tax free interspousal transfer" means he did not agree to pay the taxes from selling a collectible, and thus he should have been permitted to transfer in-kind property to satisfy his equalization obligations.

The court was not required to accept this argument. The MSA's tax-free interspousal provision was based on the "applicable provision of the Internal Revenue Code," which provides that transfers between spouses incident to a divorce do not constitute an income tax event, and therefore there are *no income tax consequences* to the receiving party for such transfers. (26 U.S.C. § 1041; see *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 762.) This principle is not necessarily the same as the issue whether a spouse selling property to fund an equalization-payment obligation must pay any taxes upon the sale of the property. As Wife points out, Husband presented no legal authority or evidence, nor made any attempt to present authority or evidence, as to whether he would be required to pay taxes and the *amount* of such taxes (if any) if he sold his collectibles to pay the required equalization payments to Wife. His claim in his appellate brief that his tax burden would be $1.7 million if he was required to "sell pre-existing items to raise cash" is unsupported, as is his claim that the court would not permit him to present this evidence.

Although the court could have found that Husband's understanding of the MSA's interspousal-transfer income tax provision reflected his unilateral mistake that an in-kind transfer was permissible, it was not required to do so. Based on the MSA terms and the evidence at the hearing, the court could reasonably conclude that when the parties signed

the MSA, they understood and intended that Husband, and not Wife, would bear the costs of selling any asset, including any related taxes arising from the sale.

### III.  *Materiality*

To establish grounds to set aside a judgment under section 2122, subdivision (e), the party must *also* show the mistake was material. (§ 2121, subd. (b); *Rosevear, supra,* 65 Cal.App.4th at pp. 684-685, & fn.11.)  The party must prove the mistake resulted in a "material disadvantage" to him.  (*Rosevear,* at p. 685, fn. 11; *Kieturakis, supra,* 138 Cal.App.4th at p. 89.)

The court found Husband did not meet his burden on this element because he did not present credible evidence as to the community estate's total value.  The court said without such evidence, it did not have a reasonable basis to conclude that if the court set aside the MSA and Judgment that Husband would receive a greater share of the parties' community property.

In challenging this finding, Husband argues the record showed that allowing him to pay "in-kind" would clearly be more advantageous to him than requiring a cash payment.  However, this is not the applicable standard.  It was undisputed at trial that Wife had never in fact agreed to accept "in-kind" payments.  So in determining whether Husband met his burden on materiality, the court was not required to compare "in-kind" transfers with "cash" payments.  Rather, the court was required to consider whether Husband would achieve a better result if the MSA was vacated and the couple was required to start anew to value and then equally divide all of their community property.  The court had a

23

reasonable basis to conclude Husband did not meet this burden to establish he would be in a better position if this were to occur.

### IV. *Collateral Estoppel*

Husband contends the court erred in concluding Commissioner Clements's ruling was final for purposes of applying the collateral estoppel and/or res judicata doctrines. Husband argues that Commissioner Clements's order did not have the "the language or finality of a judgment" to serve as res judicata or collateral estoppel.

This argument is forfeited because Husband's counsel conceded at trial that this prior order was a final order and that the parties could not, and would not, relitigate the issue of the meaning of the MSA.

Husband argues the court erred "by not allowing [him] to develop the Mistake issues based on the 'cash' vs 'in-kind' confusion, by simply brushing it away as res judicata." The argument is unavailing because the court *did* allow Husband to fully develop his unilateral mistake claim (including by allowing him to testify for six days on this issue) and *did not* "*brush*[ ] it away as res judicata." Husband cites to the court's statement at the end of trial in which the court rejected Husband's counsel's request that it *reinterpret* the MSA "to allow the $2.8 million equalization payment owed by [Husband] . . . to be satisfied either in cash and/or in-kind." This statement does not reflect the court improperly believed it could not rule on the mistake issue. Rather, the court was merely reiterating its earlier ruling (agreed to by both counsel) that it would not reconsider the issue already resolved by Commissioner Clements (concerning the objective meaning of the MSA).

## V.  *Exhibits and Augmentation Request*

Husband requests we augment the record with an August 8, 2016 letter to Wife's counsel from Husband's trial attorney, and a document purporting to be a September 7, 2016 email from Commissioner Clements to the parties' counsel.  We deny this request because there is no indication these documents were before Judge Jessop in the set-aside proceedings.  (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)  In any event, these documents are not material.  They concern views expressed by Husband's trial counsel and Commissioner Clements regarding his prior ruling (after the ruling was issued).  These views have no relevance to the issues before us.

After the appeal was fully briefed, this court noted the parties had not filed the exhibits cited in their appellate briefs, and gave counsel additional time to lodge those exhibits.  In response, both parties promptly filed those exhibits.  Wife then objected to four of the Husband's submitted exhibits, arguing they were never presented to the court below and/or they are irrelevant.  We agree with both grounds, and strike those exhibits.

DISPOSITION

Order affirmed.  Appellant to bear respondent's costs on appeal.


HALLER, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.